5/3/2019 3:54 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 33299661
By: C Ougrah
Filed: 5/3/2019 3:54 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ALLEY THEATRE | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HANOVER INSURANCE CO., | § | |
| | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES **ALLEY THEATRE**, as Plaintiff, complaining of **HANOVER INSURANCE CO**., hereinafter referred to as Defendant, and for cause of action herein would respectfully show unto the Court as follows:

## PARTIES

1.    Plaintiff the Alley Theatre ("Alley") brings this complaint against defendant Hanover Insurance Company ("Hanover") for breach of contract and bad faith, and alleges the following:

2.    The Alley Theatre is a nationally recognized not-for-profit performing arts company and a cornerstone of the Houston fine arts community.  The Alley's performance spaces and primary facilities are located at 615 Texas Avenue in the heart of Houston's downtown theater district.

3.    Defendant Hanover Insurance Company is a foreign corporation conducting business in Texas. Defendant has not designated an agent for service of process in the State of Texas. This suit arises out of Defendant's business in Texas. Accordingly, it is appropriate to serve Defendant with process in this action by serving a copy of this petition and citation on the Secretary

**Exhibit A to NOR**

of State of the State of Texas, Defendant's statutorily designated agent for service of process under

Section 17.044 of the Texas Civil Practice and Remedies Code. Defendant may be served with

citation through the Secretary of State at Citations Unit, P.O. Box 12079, Austin, Texas 78711-

2079 or 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State shall mail a copy

of the citation and the petition to Defendant, c/o its registered agent, Charles F. Cronin at 440

Lincoln St. Worcester, Massachusetts 01653.

## DISCOVERY

4.   Plaintiff intends to conduct discovery under Level 2 of Rule 190.3 of the Texas Rules

of Civil Procedure.

## JURISDICTION AND VENUE

5.   Jurisdiction is proper because the amount in controversy exceeds the minimum

jurisdictional limits of this Court.

6.      Venue is proper pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a) because the

plaintiff has its principal place of business in Harris County, and the facts giving rise to this lawsuit

occurred in Harris County.

## FACTS

### The Alley purchases the subject policy from Hanover

7.      In 2016, the Alley purchased a Commercial Lines Policy from Hanover covering

the period August 31, 2016 through August 31, 2017.  The Hanover insurance issued to the Alley

bears policy number RHD 759991213 and is attached hereto as exhibit 1.

2

Exhibit A to NOR

8.     The Hanover Policy provides approximately $156.9 million of coverage for property damage, lost income and expenses, as set forth in the "Schedule of Coverages Commercial Output Program" which states:

> Catastrophe Limit – The most "we" pay for any combination of or total of losses arising under one or more coverages in any one occurrence is: $156,890,000.

### Hurricane Harvey devastates the Alley

9.     On August 17, 2017 a tropical storm over the Caribbean was assigned the name Harvey by the United States National Hurricane Center.  On August 24 the storm was upgraded from a tropical storm to a category 4 hurricane.

10.     On August 25, 2017 Hurricane Harvey struck Texas, causing extensive damage to the Houston area, including to the downtown theater district, and specifically to the Alley Theatre.

11.     The storm's damage to the Alley's facilities required the complete shutdown of the theatre's operations for months.  Huge quantities of water needed to be pumped from the Alley's lower levels, where waters reached the ceilings.  The Neuhaus Theatre, one of the two primary performance spaces in the Alley, was nearly a total loss.  In addition, tens of thousands of stage props, along with light, sound and laundry equipment were destroyed.

12.     Because the performance spaces and facilities on Texas Avenue were unusable for months following the hurricane, the Alley was forced to cancel several performances and find an alternative venue for certain performances while remediation and repair work was underway at the Texas Avenue location.  The Alley had to cancel or relocate four productions scheduled for performances in the Neuhaus Theatre.  The Alley was able to secure the 185 seat Jose Quintero theatre at the University of Houston (a smaller stage) for one production from September 15

Exhibit A to NOR

through October 15, 2017, but was unable to relocate its second major production of the 2017 fall season that had been scheduled to be performed in the Alley's 774 seat Hubbard Theatre.

13.     More than a year and a half has passed since Hurricane Harvey.  The Alley has spent more than $12 million to repair the building and the Alley is back in business in its home in downtown Houston.  In addition to the repair cost and approximately $4 million in lost theatrical equipment and props, the Alley lost substantial revenue and incurred significant expenses – more than $5 million – while the theatres were unusable.

**Hanover's response to The Alley**

14.     Within a week of the hurricane, the Alley notified Hanover of the damage and the Alley has been continually engaged with Hanover for the past 18 months regarding the extent of the damage and the steps taken to repair and reopen the Alley Theatre.

15.     Despite the Alley's efforts to get Hanover to pay what is owed under the policy, Hanover has denied and delayed payments for the Alley's claimed losses that Hanover knows or should know are covered by the Policy.  Although Hanover has paid certain amounts due under the Policy, it has blatantly denied its obligation to pay for more than $5 million in lost income and expenses covered by the income coverage portion of the Policy and more than $7 million covered by the property damage provisions of the Policy.

16.     Hanover's delays and denials in providing compensation for these losses place Hanover in breach of the Policy and constitute bad faith.

**Hanover denies payment for lost earnings, operating expenses, and extra expense**

17.     Hanover's Policy includes a "Commercial Output Income Coverage Part" that covers lost earnings, continuing operating expenses, and extra expense incurred during the restoration period when Alley's business was interrupted:

Exhibit A to NOR

"We" cover "your" actual loss of net income (net profit or loss before income taxes) that would have been earned or incurred and continuing operating expenses normally incurred by "your" "business", including but not limited to payroll expense . . .

"We" cover the extra expenses that are necessary during the restoration period that you would not have incurred if there had been no direct physical loss or damage to property . . .

"We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location", replacement location, or a temporary location.  This includes expenses to relocate and costs to outfit and operate a replacement or temporary location . . .

"We" will also cover any extra expense to reduce the interruption of "business" if it is not possible for "you" to continue operating during the "restoration period".

18.     Despite the clear language of the Policy which required Hanover to compensate the Alley for lost earnings, continuing operating expenses, and extra expense, including the cost of cancelling shows and putting on shows at replacement venues, Hanover has denied coverage and refused to pay the Alley anything under the Income Coverage provisions of the Policy.

19.     Hanover told the Alley that its lost income and covered expenses are subsumed within the Policy's coverage for property damage caused by flood, which is capped at $3 million. Hanover's position is untenable and contrary to any reasonable interpretation of the Policy, which expressly restricts the Policy's $3 million Flood limit to property damage.  It does not apply to lost income or covered expenses.

20.     Hanover has delayed resolution of the Alley's claim for these losses by requesting multiple rounds of increasingly detailed documentation requiring many hours of time by the Alley staff to compile. Hanover's requests are solely for purposes of delay and are not meant to bring this matter to a resolution. Hanover has steadfastly maintained that the Alley's income losses and covered expenses are subject to the Policy's $3 million Flood limit (which by its own terms limits

only property damage, not lost income and expenses), and Hanover has denied coverage on that basis alone. Additional documentation concerning Alley's claim will not change Hanover's denial, and will not resolve the underlying dispute.

21.     The Policy's Flood Endorsement states:

> When blanket flood coverage is indicated on the "schedule of coverages," "we" cover **direct physical loss to covered property** at "covered locations" caused by "flood". . . . the following **"limits" apply to loss to covered property** caused by "flood" . . . . (emphasis added).

22.     By its own terms, the Flood Endorsement makes clear that its $3 million limit applies only to direct physical loss to covered property.  It does not limit any other category of loss, such as lost earnings and expense coverage.

23.     The schedule of coverages includes a completely separate "Income Coverage Part" for business interruption losses, setting a separate limit of $5,040,000 for lost income and expenses during the restoration period.  This separate income coverage, with its separate limit, further demonstrates that the Flood limit for property damages does not apply to the Alley's separate income coverage for business interruption damages.

**Hanover denies coverage for property damage caused by sprinkler leakage.**

24.     One level below Texas Avenue, a vault in the Alley's basement houses CenterPoint Energy's electrical equipment that provides power to the Alley.  The vault is ventilated by two shafts rising to above street level and covered with iron grates in the ramp accessing the Alley. Below ground, the vault was separated from the lower levels of the Alley by a concrete block wall.

25.     As heavy rain fell and accumulated during Hurricane Harvey, water flowed through the grate covers into the underground vault.  Hurricane waters filled the vault and broke through the wall separating the vault from the Alley basement.

Exhibit A to NOR

26.     When the water broke through, a portion of the wall broke open a two-inch sprinkler pipe in the Alley basement.  According to water meter readings, more than a million gallons of water leaked out of the broken sprinkler pipe and into the Alley basement before the sprinkler system could be shut off.

27.     The combination of rain water and sprinkler water filled the lower levels of the Alley, in some places to the ceiling, causing extensive damage to the building and its contents.

28.     The Policy's property damage coverage is laid out in the "Commercial Output Program Property Coverage Part" of the Policy.  The specific perils covered by the Policy include both sprinkler leakage and hurricane: "Specified Perils means . . . explosion . . . fire . . . leakage from fire extinguishing equipment . . . water damage . . . and windstorm."

29.     The standard policy language excludes coverage for flood but expressly includes coverage for property damage caused by sprinkler leakage.  The Perils Excluded section of the Property Coverage Part of the Policy states:

> "Flood – "We" do not pay for loss caused by "flood".  However, "we" do cover the resulting loss if fire, explosion, or sprinkler leakage results.

30.     The Alley purchased a Flood Endorsement, which eliminates the flood exclusion from the Policy.  The Flood Endorsement states that "Under Perils Excluded, the exclusion for Flood is deleted."  The Flood Endorsement limits coverage for property damage caused by flood to $3 million.  The Flood Endorsement does not purport to limit any loss under the Policy, other than physical loss to covered property caused by flood.  The Flood Endorsement limit does not limit coverage related to any perils under the Policy, other than flood.

31.     Nothing in the Flood Endorsement suggests or implies or can be reasonably interpreted as removing coverage for sprinkler leakage.  It is unreasonable to interpret the Policy as providing that by paying an additional premium to acquire flood protection, the Alley somehow

7

gave up coverage for specified covered perils of fire, explosion, sprinkler leakage, water damage, or windstorm.

32.     The Policy provides up to $156.9 million of coverage for property damage, as set forth in the "Schedule of Coverages Commercial Output Program" which states:

Catastrophe Limit – The most "we" pay for any combination of or total of losses arising under one or more coverages in any one occurrence is:  $156,890,000.

33.     The cost to repair the damage and restore the Alley's building on Texas Avenue was more than $10 million, which is well within the limit of coverage provided by the Policy.

34.     Hanover takes the position that the $3 million flood limit includes not only the lost income and expenses described above, but also the losses resulting from the million gallons of water that leaked out of the sprinkler system into the Alley basements.

35.     Hanover's denial of coverage for the million gallons of sprinkler leakage is not a reasonable reading of the Policy and its denials and delays are in breach of the Policy and taken in bad faith.

**Named Storm Hurricane Harvey caused the Alley damage**

36.     The Policy includes a "Named Storm Deductible Endorsement" which states

In this endorsement a named storm refers to weather related events given a name or designated by the National Weather Center as such.  The deductible provision under How Much We Pay is replaced by provisions for Flat Deductible or Percentage Deductible when loss to covered property is caused by or results from a named storm.  Loss or damage resulting from a covered weather condition, other than from a named storm, will be considered part of the named storm occurrence if the loss or damage would not have occurred without the weather conditions from the named storm.

37.     The Policy includes a list of "Perils Excluded" from coverage.  The Perils Excluded language sets out each of the perils for which coverage is not provided, including earth movement,

Exhibit A to NOR

nuclear hazard, utility failure, sewer backup, and others.  There is no exclusion for the peril of a Named Storm.

38.     Other endorsements, such as Flood, contain explicit limits on coverage; Named Storm does not contain any limitation.  As a result, the coverage limits for Named Storm are the general policy limit of $156.9 million, well above the loss to the Alley.

39.     In the event of a Named Storm, the Policy deductible increases from $25,000 to 1% of the value of the covered property.

40.     Hanover invoked the Named Storm deductible on September 9th and 10th, 2017. Hanover retracted that position on September 22, 2017, choosing the lower deductible and claiming the Alley's losses were subject to the $3 million flood limit, rather than the unlimited peril of Named Storm.

41.     On February 19, 2019, the Alley provided Hanover notice of its claims pursuant to Texas Insurance Code 542A. On April 18, 2019, Hanover responded and continued to deny coverage.

## CLAIMS

### First Claim for Relief – Breach of Contract Against Hanover

42.     Plaintiff restates and incorporates all the paragraphs above into this claim for relief.

43.     Hanover sold the Policy to the Alley and the Policy obligates Hanover to pay for the Alley's lost income and expenses caused by Hurricane Harvey up to a limit of $5,040,000. The Alley has provided Hanover with proof of covered income losses and expenses well in excess of the $5.04 million limit, but Hanover has refused to pay any amount owed pursuant to the earnings and extra expense coverage provisions.

Exhibit A to NOR

44.     The Alley promptly advised Hanover of its lost income and expenses and continued to provide updated information and supporting materials to Hanover, but Hanover continues to refuse to pay the Alley for these covered losses and expenses.

45.     The Policy obligates Hanover to pay for the Alley's remediation and repair of its building on Texas Avenue up to a maximum of $156 million.   The Alley promptly advised Hanover of the damage to the theater building caused by Hurricane Harvey and sprinkler leakage. The Alley has continued to provide updated information and supporting materials to Hanover concerning the repairs.   But Hanover has paid the Alley only $3 million for property damage, claiming all building damage is subject to the Policy cap on losses due to flood.

46.     The Alley has satisfied all conditions precedent and obligations required by the Policy.

47.     Hanover is in breach of the obligations imposed on it by the Policy.

**Second Claim for Relief – Breach of Texas Insurance Code Against Hanover**

48.     Plaintiff restates and incorporates all the paragraphs above into this claim for relief.

49.     The Alley suffered various losses covered by the Policy, promptly notified Hanover of its losses, satisfied all conditions of the policy and provided Hanover with statutory notice of its claim under Texas Insurance Code Chapter 542A .

50.     Hanover is liable for the claim and had a duty to pay the claim in a timely manner.

51.     Hanover breached its duties under the Texas Insurance Code Chapter 542 by failing to comply with the deadlines imposed by that Chapter, including by:

- Failing to notify the Alley in writing of the acceptance or rejection of the Alley's claim within the time required under Texas Insurance Code § 542.056;

Exhibit A to NOR

- Failing to notify the Alley in writing within the time required under Texas Insurance Code § 542.056 of any need for additional time to accept or reject the Alley's claim; and

- Failing to pay the Alley's claim within the time required under Texas Insurance Code § 542.058.

52.     As a result of its violation of Texas Insurance Code Chapter 542, Hanover is liable to pay the Alley 18% interest per year (per violation) on the amount of its claim as damages under Texas Insurance Code § 542.60, in an amount to be determined at trial.

53.     Hanover is also liable to the Alley for reasonable attorney's fees under Texas Insurance Code § 542.60, in an amount to be determined at trial.

**Third Claim for Relief – Bad Faith Against Hanover**

54.     Plaintiff restates and incorporates all the paragraphs above into this claim for relief.

55.     Coverage under the Policy for the Alley's lost income and expenses is reasonably clear from the express language of the Policy.

56.     Coverage for property damage resulting from the sprinkler leakage is reasonably clear from the express language of the Policy.

57.     Coverage for property damage from water damage and named storms, such as Hurricane Harvey, is reasonably clear from the express language of the Policy.

58.      Despite the clear language of the Policy, Hanover has refused to pay and has delayed payment of monies owed to the Alley pursuant to the Policy.

59.     As a result of Hanover's bad faith refusal to pay amounts due under the policy, the Alley has been forced to (a) bear the financial burden of these losses for more than a year, (b) utilize funds from donors to cover these losses and thereby decrease the funds from donors that

Exhibit A to NOR

would otherwise be available to the Alley for other purposes, and (c) incur related costs and expenses that would not have been incurred if Hanover had not acted in bad faith.

## DEMAND FOR JURY TRIAL

60.    Plaintiff hereby demands trial by jury.

## CONDITIONS PRECEDENT

61.    All conditions precedent to Plaintiff's claim for relief have been performed or have occurred.

## REQUEST FOR DISCLOSURE

62.    Plaintiff requests that Defendant disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Alley Theatre respectfully requests that judgment be entered in its favor and against Wortham and Hanover as follows:

- On the Alley's first cause of action, awarding compensatory damages for Hanover's breach of its contractual obligations pursuant to the Policy in an amount to be determined at trial;

- On the Alley's second cause of action, awarding compensatory, statutory, punitive and any other available damages for Hanover's bad faith delay and refusal to pay valid claims;

- For reasonable attorneys' fees and enhanced interest, including pursuant to TCPRC 38.001, Texas Insurance Code 542.60, and Texas Insurance Code 542A;

- For pre-judgment and post judgment interest; and

- Awarding the Alley such other and further relief available under the law.

Exhibit A to NOR

Dated: May 3, 2019

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: /s/ *Neal S. Manne*

Neal S. Manne
Attorney-in-charge
State Bar No. 12937980
S.D. Adm. #10209
nmanne@susmangodfrey.com
James T. Southwick
State Bar No. 24001521
S.D. Adm. #21854
jsouthwick@susmangodfrey.com
William R.H. Merrill
State Bar No. 24006064
S.D. Adm. # 23601
bmerrill@susmangodfrey.com
Jonathan J. Ross
State Bar No 00791575.
S.D. Adm. # 18293
jross@susmangodfrey.com
Chanler A. Langham
State Bar No. 24053314
S.D. Adm. # 659756
clangham@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666

*Attorneys for Plaintiff Alley Theatre*

Exhibit A to NOR

# EXHIBIT 1

Exhibit A to NOR



RHD 7599912 12
**Renewal of Number**

### COMMERCIAL LINES POLICY
### COMMON DECLARATIONS
### COMMERCIAL MARINE

| **Coverage is provided in the:** | HANOVER INSURANCE COMPANY |
| | 440 LINCOLN STREET |
| | WORCESTER, MASSACHUSETTS  01653 |

| POLICY NUMBER | POLICY PERIOD | | | AGENCY CODE |
|---|---|---|---|---|
| | FROM | TO | | |
| RHD 7599912 13 | 08/31/2016 | 08/31/2017 | AT 12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ON THE COMMON DECLARATION. | 1606180 |

| NAMED INSURED AND MAILING ADDRESS | AGENT |
|---|---|
| (Street, Town or City, County, State, Zip Code) | |
| ALLEY THEATRE | JOHN L WORTHAM & SON LP |
| 615 TEXAS AVENUE | PO BOX 1388 |
| HOUSTON, TX 77002 | HOUSTON, TX 77251 |

DESCRIPTION OF BUSINESS

☐ Individual   ☒ Corporation   ☐ Partnership   ☐ Joint Venture   ☐ Other:

Business Description:  THEATRE

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S) FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | | PREMIUM |
|---|---|---|
| • | Commercial Property Coverage Part .................................. | $          199,564 |
| • | Commercial Crime Coverage Part ..................................... | $ |
| • | Commercial Inland Marine Coverage Part ........................... | $          10,538 |
| • | Boiler and Machinery Coverage Part .................................. | $ |
| • | Ocean Marine ................................................................. | $ |
| • | Terrorism ....................................................................... | $          5,778 |
| • | State Surcharges | $ |

| PREMIUM | PAYMENT PLAN: |
|---|---|
| ☒ The total premium of          $          215,880          is due at inception | AGENCY BILL/PREPAID |
| ☐ The total premium includes a deposit premium subject to adjustment | |

See list of Form (s) and Endorsement(s) applicable to all Coverage Part(s) and made a part of this policy at time of issue.

Countersigned:

By _____

Authorized Representative

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PARTS COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Includes copyrighted material of Insurance Services Office, Inc., with permission, Copyright, Insurance Services Office, Inc., 1983, 1984

IM441-1056 (06-08)

**Page 1 of 2**

ALLEY ONR008
Exhibit A to NOR

**FORMS AND ENDORSEMENTS APPLICABLE TO ALL COVERAGE PARTS AND MADE A PART OF THIS POLICY AT TIME OF ISSUE**

231-0862 (12/14)
IM 201 (05/08)
401-1122 (02/14)
401-1127 (01/15)
401-1374 (01/15)
CO 1050 (03/05)
CO 1052 (04/02)
CO 1079 (11/03)
CO 1235 (04/02)
221-0163 (10/03) A-B
THEATRICAL PROPERTY DEC PAGE
CL 0100 (03/99)
CL 0273 (05/14)
CL 0700 (10/06)
CO 0314 (01/12)
IL 0952 (01/15)
CM 0001 (09/04)
IL 0017 (11/08)
CM 0112 (09/13)
IL 0171 (09/07)
IL 0288 (10/01)
CL 0600 (01/15)
CO 1000 (10/02)
CO 1001 (04/02)
CO 1221 (04/02)
CO 1223 (04/02)
CO 1227 (05/02)
CO 1281 (04/02)
CO 1293 (11/03)
IM 441-1029 (01/08)
IM 441-1046 (05/08)
THEATRICAL PROPERTY COVERAGE FORM
SIG 1100 (08/16)

IM441-1056 (06-08)

**Page 2 of 2**

MILLER ONOR
Exhibit A to NOR

# Customer Notice of Privacy Policy and Producer Compensation Practices Disclosures

## Privacy Policy Disclosure

### *Collection of Information*

We collect personal information so that we may offer quality products and services. This information may include, but is not limited to, name, address, Social Security number, and consumer reports from consumer reporting agencies in connection with your application for insurance or any renewal of insurance. For example, we may access driving records, insurance scores or health information. Our information sources will differ depending on your state and/or the product or service we are providing to you. This information may be collected directly from you and/or from affiliated companies, non-affiliated third parties, consumer reporting agencies, medical providers and third parties such as the Medical Information Bureau.

We, and the third parties we partner with, may track some of the web pages you visit through cookies, pixel tagging or other technologies. We currently do not process or comply with any web browser's "do not track" signals or similar mechanisms that request us to take steps to disable online tracking. For additional information regarding online privacy, please see our online privacy statement, located at [www.hanover.com](www.hanover.com).

### *Disclosure of Information*

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with our insurance company affiliates or with third parties that assist us in processing and servicing your account. We also may share your information with regulatory or law enforcement agencies, reinsurers and others, as permitted or required by law.

Our insurance companies may share information with their affiliates, but will not share information with non-affiliated third parties who would use the information to market products or services to you.

Our standards for disclosure apply to all of our current and former customers.

### *Safeguards to Protect Your Personal Information*

We recognize the need to prevent unauthorized access to the information we collect, including information held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect the confidentiality and integrity of all non-public, personal information, including but not limited to social security numbers, driver's license numbers and other personally identifiable information.

### *Internal Access to Information*

Access to personal, non-public information is limited to those people who need the information to provide our customers with products or services. These people are expected to protect this information from inappropriate access, disclosure and modification.

### *Consumer Reports*

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;
- credit history, driving record (including records of any operators who will be insured under the policy); and/or
- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.

### *Access to Information*

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances, you may be entitled to a copy at no cost.

Page 1 of 2

Exhibit A to NOR

You also may review certain information we have about you or your business in our files. To review information we maintain in our files about you or your business, please write to us, providing your complete name, address and policy number(s), and indicating specifically what you would like to see. If you request actual copies of your file, there may be a nominal charge.

We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a record indicating that the information was provided to another party, we will tell you to whom such information is normally disclosed.

There is information that we cannot share with you. This may include information collected in order to evaluate a claim under an insurance policy, when the possibility of a lawsuit exists. It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be properly explained.

### *Correction of Information*

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position. The information in question will be investigated. If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified. However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed. If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect. We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

### *Our Commitment to Privacy*

In the insurance and financial services business, lasting relationships are built upon mutual respect and trust. With that in mind, we will periodically review and revise our privacy policy and procedures to ensure that we remain compliant with all state and federal requirements. If any provision of our privacy policy is found to be non-compliant, then that provision will be modified to reflect the appropriate state or federal requirement. If any modifications are made, all remaining provisions of this privacy policy will remain in effect. For more detailed information about our customer privacy policy (including any applicable state-specific policies) and our online privacy statement, visit our Web site, located at www.hanover.com.

### *Further Information*

If you have questions about our customer privacy policy (including any applicable state-specific policies) or our online privacy statement, or if you would like to request information we have on file, please write to us at our Privacy Office, N435, The Hanover Insurance Group, Inc., 440 Lincoln Street, Worcester, MA 01653. Please provide your complete name, address and policy number(s). A copy of our Producer Compensation Disclosure is also available upon written request addressed to the attention of the Corporate Secretary, N435, The Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653.

### Producer Compensation Disclosure

Our products are sold through independent agents and brokers, often referred to as "Producers." We may pay Producers a fixed commission for placing and renewing business with our company. We may also pay additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us. Details of our Producer compensation practices may be found at www.hanover.com.

This notice is being provided on behalf of the following Hanover Companies: The Hanover Insurance Group, Inc. - Allmerica Financial Alliance Insurance Company - Allmerica Financial Benefit Insurance Company - Allmerica Plus Insurance Agency, Inc. - Citizens Insurance Company of America - Citizens Insurance Company of Illinois - Citizens Insurance Company of the Midwest - Citizens Insurance Company of Ohio - Citizens Management, Inc. - AIX Ins. Services of California, Inc.- Campania Insurance Agency Co. Inc. - Campmed Casualty & Indemnity Co. Inc. - Chaucer Syndicates Limited- Educators Insurance Agency, Inc.- Hanover Specialty Insurance Brokers, Inc. - The Hanover American Insurance Company - The Hanover Insurance Company - The Hanover New Jersey Insurance Company - The Hanover National Insurance Company - Hanover Lloyd's Insurance Company - Massachusetts Bay Insurance Company - Opus Investment Management, Inc. - Professionals Direct Insurance Services, Inc. -Professional Underwriters Agency, Inc. - Verlan Fire Insurance Company - Nova Casualty Company - AIX Specialty Insurance Company.

231-0862 12 14



# Commercial Marine

# REPORTING CLAIMS

**In the event of a claim losses must be reported by the insured or agent immediately through our National Claims Reporting Line @ 1-800-628-0250.**

**The caller then presses 2.  This delivers the call to our Customer Care Team.  Our representative will take the loss report and assign an adjuster.**

**Losses can also be faxed to us @ 1-800-399-4734.**

Exhibit A to NOR

# TEXAS POLICYHOLDER NOTICE
# IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the company's telephone number for information or to make a complaint at:

**1-800-608-8141**

You may write the Company at:

**The Hanover Insurance Company**
**Premier Place**
**5910 North Central Expressway**
**Suite #300**
**Dallas, TX 75206**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

**1-800-252-3439**

You may write the
Texas Department of Insurance
PO Box 149104
Austin, TX 78714-9104
**FAX#** (512) 475-1771

**Web: http://www.tdi.texas.gov**

**E-mail: ConsumerProtection@tdi.texas.gov**

**PREMIUM OR CLAIMS DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono de la compania para informacion o para someter una queja al:

**1-800-608-8141**

Usted tambien puede escribir a:

**The Hanover Insurance Company**
**Premier Place**
**5910 North Central Expressway**
**Suite #300**
**Dallas, TX 75206**

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas
PO Box 149104
Austin, TX 78714-9104
**FAX#** (512) 475-1771

**Web: http://www.tdi.texas.gov**

**E-mail: ConsumerProtection@tdi.texas.gov**

**DISPUTAS SOMBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

**AVISO IMPORTANTE**

**Page 1 of 1**

401-1122 02 14

Exhibit A to NOR

THIS NOTICE IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT, AS AMENDED. THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY. IF THERE IS A CONFLICT BETWEEN THIS NOTICE AND THE POLICY, THE PROVISIONS OF THE POLICY SHALL APPLY.

# NOTICE – ACCEPTANCE OF TERRORISM COVERAGE AND DISCLOSURE OF PREMIUM

|  Schedule | |
| --- | --- |
| **Disclosure of Premium:** | |
| Total Terrorism Premium | **$ 5,778** |
| Fire Following Premium | **$ NOT APPLICABLE** |
| Other than Fire Following Premium | **$ 5,778** |

Coverage for "acts of terrorism," as defined in Section 102(1) of the Terrorism Risk Insurance Act ("Act") is included in your policy. You are hereby notified that under the Act, as amended in 2015, the definition of "act of terrorism" is:

> Any act or acts that are certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

**Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States government through the Department of the Treasury may pay a share of terrorism losses insured under the federal program under a formula set forth in the Act. Under this formula, the United States government generally reimburses the following percentage of covered terrorism loss which exceeds the statutorily established deductible paid by the insurance company providing the coverage: 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020.

**Cap on Insurer Participation in Payment of Terrorism Losses**

The Act contains a $100 billion cap that limits the reimbursement by the United States government as well as insurers' liability for losses resulting from certified acts of terrorism. If the aggregate of insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Page 1 of 1**

THIS NOTICE IS PROVIDED IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS NOTICE DOES NOT GRANT COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF COVERAGE UNDER THE POLICY. IF THERE IS A CONFLICT BETWEEN THIS NOTICE AND THE POLICY, THE PROVISIONS OF THE POLICY SHALL APPLY.

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

Schedule

| | |
|---|---|
| **Disclosure of Premium:** | |
| Total Terrorism Premium | **$ 5,778** |
| Fire Following Premium | **$ NOT APPLICABLE** |
| Other than Fire Following Premium | **$ 5,778** |
| | |

**Disclosure of Terrorism Coverage Available**

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from "acts of terrorism" defined in Section 102(1) of the Act as follows:

> Any act or acts that are certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

The premium charged for this coverage is provided in the Schedule above and does not include any charges for the portion of loss that may be covered by the Federal Government as described below.

Your policy may contain other exclusions which could affect your coverage, such as an exclusion for Nuclear Events or Pollution. **Please read your policy carefully**.

**<u>Note for Commercial Property or Commercial Inland Marine Policyholders in Standard Fire States:</u>**

In your state, a terrorism exclusion makes an exception for (and therefore provides coverage for) fire losses resulting from an act of terrorism. If you reject the offer of terrorism coverage, therefore, that rejection does not apply to fire losses resulting from an act of terrorism. Coverage for such fire losses will be provided in your policy. The additional premium just for such fire coverage is shown in the Schedule above.

**Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States government through the Department of the Treasury may pay a share of terrorism losses insured under the federal program under a formula set forth in the Act. Under this formula, the United States government generally reimburses the following percentage of covered terrorism loss which exceeds the statutorily established deductible paid by the insurance company providing the coverage: 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020.

Page 1 of 2

**401-1374 01 15**      Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RILEY O'NOR
Exhibit A to NOR

**Cap on Insurer Participation in Payment of Terrorism Losses**

The Act contains a $100 billion cap that limits the reimbursement by the United States government as well as insurers' liability for losses resulting from certified acts of terrorism. If the aggregate of insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.


**Rejection of Terrorism Insurance Coverage**

☐    I decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism.

_____

Applicant/Policyholder Signature

**HANOVER INSURANCE COMPANY**
**Insurance Company**
**RHD 7599912 13**

**Print Name**

**Quote or Policy Number**

_____

**Date**

**Page 2 of 2**

Exhibit A to NOR

**AAIS**
**CO 1050 03 05**
**Page 1 of 6**

# SCHEDULE OF COVERAGES
# COMMERCIAL OUTPUT PROGRAM

(The information required to complete this schedule
will be shown below or on the "schedule of coverages".)

Limit of Insurance

**Catastrophe Limit** -- The most "we" pay for
any combination of or total of losses arising under
one or more coverages in any one occurrence is:      $ 156,890,000

---

## PROPERTY COVERAGE PART

**LIMITS**

-- Building Property Limit -- The most
"we" pay for loss at any one "covered location" is:      $ _____

-- Business Personal Property Limit -- The most
"we" pay for loss at any one "covered location" is:      $ 26,850,000

or

-- Combined Blanket Limit -- The most "we" pay
for loss at any one "covered location" is:      $ _____

☒ Refer To Scheduled Locations

**COVERAGE EXTENSIONS**

-- Consequential Loss    BUSINESS PERSONAL PROPERTY LIMIT

-- Debris Removal, Additional Expense    $ 50,000

-- Emergency Removal    365 days

-- Emergency Removal Expense    $ 5,000

-- Fraud and Deceit    $ 5,000

-- Damage From Theft    POLICY LIMIT

-- Off Premises Utility
Service Interruption
  -    Limit    $ 50,000

    ☒ Overhead Transmission Lines Excluded

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
CO 10 50 03 05
PAGE 2 OF 6

**SUPPLEMENTAL COVERAGES**

| | | |
|---|---|---|
| -- | Brands or Labels Expense | $ 50,000 |
| -- | Expediting Expenses | $ 50,000 |
| -- | Fire Department Service Charges | $ 25,000 |
| -- | Inventory and Appraisal Expense | $ 50,000 |
| -- | Ordinance or Law (Undamaged Parts of a Building) | $ BUILDING LIMIT |
| -- | Ordinance or Law (Increased Cost to Repair/ Cost to Demolish and Clear Site) | $ 3,000,000 |
| -- | Personal Effects | $ 15,000 |
| -- | Pollutant Cleanup And Removal | $ 50,000 |
| -- | Recharge of Fire Extinguishing Equipment | $ 50,000 |
| -- | Rewards | $ 10,000 |
| -- | Sewer Backup and Water Below the Surface | $ 2,000,000 |
| -- | Trees, Shrubs, and Plants | $ 50,000 |
| -- | Underground Pipes, Pilings, Bridges, and Roadways | $ 250,000 |

**SUPPLEMENTAL MARINE COVERAGES**

| | | |
|---|---|---|
| -- | Accounts Receivable | $ 50,000 |
| -- | Electrical or Magnetic Disturbance of Computers | BUSINESS PERSONAL PROPERTY LIMIT |
| -- | Power Supply Disturbance of Computers | BUSINESS PERSONAL PROPERTY LIMIT |
| -- | Virus and Hacking Coverage | |
| | - Limit any one occurrence | $ 25,000 |
| | - Limit any 12 month period | $ 50,000 |
| -- | Fine Arts | $ 161,400 |
| -- | Off Premises Computers | $ 25,000 |

Copyright, American Association of Insurance Services, Inc., 2005

**SUPPLEMENTAL MARINE COVERAGES** (cont.)

| | | |
|---|---|---|
| -- | Property On Exhibition | $ 50,000 |
| -- | Property In Transit | $ 50,000 |
| -- | Sales Representative Samples | $ 50,000 |
| -- | Software Storage | $ 50,000 |
| -- | Valuable Papers | $ 100,000 |

**ADDITIONAL PROPERTY SUBJECT TO LIMITATIONS**

| | | |
|---|---|---|
| -- | Furs (theft) | $10,000 |
| -- | Jewelry (theft) | $10,000 |
| -- | Stamps, Tickets, Letters of Credit | $5,000 |

**COVERAGE OPTIONS** (check if applicable)

☐ Actual Cash Value Applies

☐ Automatic Increase

-     Automatic Increase     __%

☒ Scheduled Locations

-     Newly Built or Acquired Buildings     $ 1,000,000
-     Personal Property - Acquired Locations     $ 500,000
-     Locations "You" Elect Not To Describe     $ 25,000
-     Coinsurance     0%

## DEDUCTIBLE

Check One

☐ Deductible Amount     $ _____

☒ Refer to Deductible Endorsements

Copyright, American Association of Insurance Services, Inc., 2005

## INCOME COVERAGE PART

**COVERAGE** (check one)

☐ Income Coverage Does Not Apply

☐ Earnings, Rents, and Extra Expense

☒ Earnings and Extra Expense

☐ Rents and Extra Expense

☐ Extra Expense Only

**LIMIT** (check one)

☒ Income Coverage Limit -- The most
"we" pay for loss at any one "covered location" is:   $ 5,040,000 _____
☒ Refer To Scheduled Locations (check if applicable)

**COVERAGE EXTENSIONS**

-- Interruption By Civil Authority                30 days

-- Period of Loss Extension                       90 days

**SUPPLEMENTAL COVERAGES**

-- Computer Virus and Hacking

   - Limit any one occurrence           $ 25,000 _____

   - Limit any 12 month period          $ 75,000 _____

   - Waiting Period                       12 HOURS _____

-- Dependent Locations                            $ 100,000 _____

-- Off Premises Utility
Service Interruption

   - Limit                              $ 50,000 _____

   - Waiting Period                       12 HOURS _____

   ☒ Overhead Transmission Lines Excluded

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
CO 10 50 03 05
Page 5 of 6

## INCOME COVERAGE PART (cont.)

**SUPPLEMENTAL COVERAGES** (cont.)

-- Contract Penalty

   - Limit any one occurrence         $ 25,000

   - Limit any 12 month period        $ 100,000

-- Pollutants Cleanup and Removal        $ 25,000

-- Property In Transit, On Exhibition, or Custody
   of Sales Representatives             $ 10,000

**COVERAGE OPTIONS** (check if applicable)

☒ Scheduled Locations

   - Newly Built or Acquired Locations     $ 250,000

   - Coinsurance                      0%

☒ Waiting Period                     48 HOURS

☐ Monthly Limitation

## FLOOD COVERAGE

☐ Not Covered

☐ Scheduled Flood Coverage

   - "Catastrophe Limit"                $

   - Flood Deductible ($,%)           $
☒ Blanket Flood Coverage

   - "Occurrence Limit"                $ 3,000,000

   - "Aggregate Limit"                  $ 3,000,000

   - "Catastrophe Limit"              $ 3,000,000

   - Flood Deductible ($,%)          $50,000

Copyright, American Association of Insurance Services, Inc., 2005

## EARTHQUAKE COVERAGE

☐ Not Covered

☐ Scheduled Earthquake Coverage

- "Catastrophe Limit"                                       $ _____

- Earthquake Deductible ($,%)                     _____

☒ Blanket Earthquake Coverage

- "Occurrence Limit"                                     $ 1,000,000_____

- "Aggregate Limit"                                       $ 1,000,000_____

- "Catastrophe Limit"                                     $ 1,000,000_____

- Earthquake Deductible ($,%)                         $25,000_____

## OPTIONAL COVERAGES AND ENDORSEMENTS

221-0163 (10/03) A & B _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**CO 1050 03 05**

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
CO 1052 04 02
PAGE 1 OF 3

# LOCATION SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Coverage provided by the Commercial Output Program coverage parts applies only to the "covered locations" described below. Refer to "schedule of coverages" for applicable "limits", additional coverages, and applicable coinsurance percentage.

## SCHEDULE

**Loc.**
**No.**                          **Covered Location** (describe)

1-1                   615 TEXAS AVE

                      HOUSTON, TX 77002


**Covered Property/**
**Coverage Provided** (describe)                        **Limit**
BUILDING                                        $ 125,000,000

BLANKET BUSINESS PERSONAL PROPERTY/             $ 26,850,000

ELECTRONIC DATA PROCESSING/MEDIA                $

BLANKET BUSINESS INCOME/                        $ 5,040,000

EXTRA EXPENSE                                   $

**Loc.**
**No.**                          **Covered Location** (describe)

2-1                   600 PRAIRIE ST

                      HOUSTON, TX 77002


**Covered Property/**
**Coverage Provided** (describe)                        **Limit**
BLANKET BUSINESS PERSONAL PROPERTY/             $ INCLUDED

ELECTRONIC DATA PROCESSING/MEDIA                $

BLANKET BUSINESS INCOME/                        $ INCLUDED

EXTRA EXPENSE                                   $

                                                $

**CO 1052 04 02**

Copyright, American Association of Insurance Services, 2002

# LOCATION SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Coverage provided by the Commercial Output Program coverage parts applies only to the "covered locations" described below. Refer to "schedule of coverages" for applicable "limits", additional coverages, and applicable coinsurance percentage.

## SCHEDULE

| Loc. No. | Covered Location (describe) |
|---|---|
| 3-1 | 600 N. SHEPHERD DR SUITE 410 |
| | HOUSTON, TX  77002 |
| | |

| Covered Property/ Coverage Provided (describe) | Limit |
|---|---|
| BLANKET BUSINESS PERSONAL PROPERTY/ | $ INCLUDED |
| ELECTRONIC DATA PROCESSING/MEDIA | $ |
| BLANKET BUSINESS INCOME/ | $ INCLUDED |
| EXTRA EXPENSE | $ |
| | $ |

| Loc. No. | Covered Location (describe) |
|---|---|
| 4-1 | 6620 FULTON ST |
| | HOUSTON, TX 77002 |
| | |

| Covered Property/ Coverage Provided (describe) | Limit |
|---|---|
| BLANKET BUSINESS PERSONAL PROPERTY/ | $ INCLUDED |
| ELECTRONIC DATA PROCESSING/MEDIA | $ |
| BLANKET BUSINESS INCOME/ | $ INCLUDED |
| EXTRA EXPENSE | $ |
| | $ |

**CO 1052 04 02**

Copyright, American Association of Insurance Services, 2002

# LOCATION SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Coverage provided by the Commercial Output Program coverage parts applies only to the "covered locations" described below. Refer to "schedule of coverages" for applicable "limits", additional coverages, and applicable coinsurance percentage.

## SCHEDULE

| Loc. No. | Covered Location (describe) |
|---|---|
| 5-1 | 2801 GULF FREEWAY |
|  | HOUSTON, TX 77034 |
|  |  |

| Covered Property/ Coverage Provided (describe) | Limit |
|---|---|
| BLANKET BUSINESS PERSONAL PROPERTY | $ INCLUDED |
| ELECTRONIC DATA PROCESSING/MEDIA | $ |
| BLANKET BUSINESS INCOME/ | $ INCLUDED |
| EXTRA EXPENSE | $ |
|  | $ |

| Loc. No. | Covered Location (describe) |
|---|---|
|  |  |
|  |  |
|  |  |

| Covered Property/ Coverage Provided (describe) | Limit |
|---|---|
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |

**CO 1052 04 02**

Copyright, American Association of Insurance Services, 2002

**AAIS**
**CO 1079 11 03**
**Page 1 of 1**

# LIMITED FUNGUS AND RELATED PERILS SCHEDULE
# LOCATION LIMIT

(The information required below may be indicated
on the "schedule of coverages".)

## SCHEDULE

**Loc.**
**No.**         **Location** (describe)

1-5              ALL COVERED LOCATIONS

                                                                    **Limit**

Limited Fungus And Related Perils
Property Coverage                                              $ 15,000 PER LOC.

Limited Fungus And Related Perils
Income Coverage                              30 days

**Loc.**
**No.**         **Location** (describe)

                                                                    **Limit**

Limited Fungus And Related Perils
Property Coverage                                              $ _____

Limited Fungus And Related Perils
Income Coverage                              ___ days

**Loc.**
**No.**         **Location** (describe)

                                                                    **Limit**

Limited Fungus And Related Perils
Property Coverage                                              $ _____

Limited Fungus And Related Perils
Income Coverage                              ___ days

**CO 1079 11 03**

Copyright, American Association of Insurance Services, Inc., 2003

RILEY O'NOR
Exhibit A to NOR

**AAIS**                                    This endorsement changes
**CO 1235 04 02**                               the policy
**Page 1 of 1**                        **-- PLEASE READ THIS CAREFULLY --**

# MULTIPLE DEDUCTIBLE
## SCHEDULED LOCATIONS AND PROPERTY

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## HOW MUCH WE PAY

The deductible provision is deleted and replaced by the following:

For the locations described on this schedule, "we" pay only that part of "your" loss over the deductible
amount indicated for the described location, in any one occurrence.

All other "covered locations" not described on the Multiple Deductible schedule

$ 25,000

| Location No. | Location |
| --- | --- |
| 1-1 TO 5-1 | ALL COVERED LOCATIONS |
| | |
| | |
| | |
| | |
| | |

| Location No. | Property/Coverage Deductible Applies to | Deductible |
| --- | --- | --- |
| 1-1 TO 5-1 | EDP EQUIPMENT | $ 1,000 |
| 1-1 TO 5-1 | FINE ARTS COVERAGE | $ 1,000 |
| 1-1 TO 5-1 | MECHANICAL BREAKDOWN ON EDP | $ 2,500 |
| 1-1 TO 5-1 | TRAILERS | $ 2,500 |
| | | $ |
| | | $ |

**CO 1235 04 02**

Copyright, American Association of Insurance Services, 2002



THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ THIS CAREFULLY.

CIVIL AUTHORITY ENDORSEMENT

Section 1 of the Income Coverage Extensions is deleted and replaced with:

1. Interruption by Civil Authority -

   a. "We" extend "your" coverage for earnings and extra expense to include loss sustained while access to "covered locations" or a "dependent location" is specifically denied by order of civil authority. This order must be as a result of direct physical loss of or damage to property, other than at a "covered location" and must be caused by a covered peril.

   b. "We" extend "your" coverage for earnings and extra expense to include loss sustained while access to "covered locations" or a "dependent location" is "restricted" due to the implementation of a curfew or evacuation by a local, state or federal governmental body, within a 50 mile radius of the affected "covered location."  The curfew or evacuation must be imposed as a direct result of a named windstorm event.

Access to a covered location is restricted when "your" labor force, actors, or patrons are unable to reasonably gain access to the affected "covered location" to attend or put on a performance due to the implemented curfew or evacuation.  Access will also be deemed "restricted" for matinees which occur on a day when a curfew or evacuation is in place.

Unless otherwise indicated on the "schedule of coverages" this Income Coverage Extension is limited to 30 consecutive days from the date of the order and is subject to the waiting period indicated on the "schedule of coverages"

**Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements or limitations of the policy other than as above stated.**

(Completion of the following, including countersignature, is required to make this endorsement effective only when it is issued subsequent to preparation of the Policy.)

Effective _____ this endorsement forms a part of Policy No. _____

Issued to

By

Date of Issue _____ Countersigned by _____

                                                Authorized Representative of the Company

A

Exhibit A to NOR



THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ THIS CAREFULLY.

NAMED STORM  DEDUCTIBLE ENDORSEMENT
COMMERCIAL OUTPUT PROGRAM

(The entries required to complete this endorsement will be shown below or on the "schedule of coverages:.)

NAMED STORM SCHEDULE
       Named Storm Deductible  (check one)
       [ ]  Flat Deductible
       [ ]  Percentage Deductible  (check one)
          [ x ]  1%       [ ]  2%      [ ]  5%
       [ X ]  Business Income & Extra Expense Waiting Period  -  96 hours

HOW MUCH WE PAY

   In this endorsement a named storm refers to weather related events given a name or designated by the National Weather Center as such.
   The deductible provision under How Much We Pay is replaced by the provisions for Flat Deductible or Percentage Deductible when loss to covered property is caused by or results from a named storm.
   Loss or damage resulting from a covered weather condition, other than from a named storm, will be considered part of the named storm occurrence if loss or damage would not have occurred with out the weather conditions from the named storm.

1. Flat Deductible – When a flat dollar named windstorm or hail deducible is indicated on the schedule, "we" pay only that part of "your" loss over the deductible amount in anyone occurrence.

2. Percentage Deductible--
   a.  Percentage -- When a 1%, 2% or 5% deductible is indicated on the named storm schedule, "we" pay only that part of "your" loss over the deductible amount in any one occurrence. The deductible amount is determined by applying the percentage indicated on the schedule to the value of the covered property that is involved in the loss excluding all fine arts property.
   b.  Value Determined at Time of Loss -- Only as regards the determination of the Percentage Deductible, the value of covered property is determined at the time of the loss or damage and in accordance with the provisions described under the Valuation section of this policy. The value of covered property is not based on the estimated completion of the covered property.
   c.  Deductible Applies Separately -- The percentage deductible applies separately to each covered building or structure.

**Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements or limitations of the policy other than as above stated.**

(Completion of the following, including countersignature, is required to make this endorsement effective only when it is issued subsequent to preparation of the Policy.)

Effective _____   this endorsement forms a part of Policy No. _____

Issued to

By

Date of Issue _____   Countersigned by _____
                                        Authorized Representative of the Company

B

## THEATRICAL FLOATER DECLARATIONS PAGE

**ITEM 1**
**Named Insured & Address**                    **Named & Address of Producer**

Alley Theatre                                  John L. Wortham & Son, L.P.
615 Texas Avenue                               P.O. Box 1388
Houston, TX 77002                              Houston, TX 77251-1388

**ITEM 2**
**Policy Period:**
     **From 12:01 AM, CST August 31, 2106 to 12:01 AM CST August 31, 2017**

| COVERAGES | LIMITS OF LIABILIATY | DEPOSIT PREMIUM |
|---|---|---|
| **SECTION I** Theatrical Property Including Camera's Backstage Property & Musical Equipment | $4,000,000. | $ Included |
| **SECTION II** Business Income Extra Expense | $300,000. | $ Included |
| **SECTION III** Actors Equity | | $ Included |
| Not to exceed | $100,000. | |
| Each member's furs | $    1,500. | |
| Each member's jewelry | $    1,500. | |
| Each member's personal effects & clothes | $    3,000. | |
| Max any Person | $    6,000. | |

TOTAL DEPOSIT PREMIUM                                         $ INCLUDED

Exhibit A to NOR

**AAIS**
**CL 0100 03 99**
**Page 1 of 1**

# COMMON POLICY CONDITIONS

1. **Assignment** -- This policy may not be assigned without "our" written consent.

2. **Cancellation** -- "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

   "We" may cancel this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

   If "we" cancel this policy for nonpayment of premium, "we" will give "you" notice at least ten days before the cancellation is effective. If "we" cancel this policy for any other reason, "we" will give "you" notice at least 30 days in advance of cancellation. The notice will state the time that the cancellation is to take effect.

   "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3. **Change, Modification, or Waiver of Policy Terms** -- A waiver or change of the "terms" of this policy must be issued by "us" in writing to be valid.

4. **Inspections** -- "We" have the right, but are not obligated, to inspect "your" property and operations at any time. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.

5. **Examination of Books and Records** -- "We" may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

---

**CL 0100 03 99**

Copyright, American Association of Insurance Services, 1998

**AAIS**
**CL 0273 05 14**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# AMENDATORY ENDORSEMENT
## TEXAS

1.  If this policy has been issued to a governmental unit, as defined under Texas regulations, under Common Policy Conditions, Cancellation is deleted and replaced by the following:

    **Cancellation And Nonrenewal**

    a.  "You" may cancel this policy at any time by notifying "us" of the date cancellation is to take effect. "We" will send "you" any refund due when the policy is returned to "us".

    b.  "We" may cancel or not renew this policy by delivering or mailing written notice to "you" at the address shown in the policy. Such notice may be delivered by electronic means if "you" have affirmatively consented to that method of delivery and have not withdrawn such consent. Proof of delivery or mailing is sufficient proof of notice. The notice will state the reason for cancellation or nonrenewal.

    c.  If this policy has been in effect for less than 90 days, "we" may cancel for any reason, except that under the provisions of the Texas Insurance Code, "we" may not cancel solely because "you" are an elected official.

    If this policy has been in effect for 90 days or more, or if it is a renewal of a policy issued by "us", "we" may cancel only if one or more of the following reasons apply:

    1)  "you" have not paid any portion of the premium when due;
    2)  "you" have submitted a fraudulent claim;
    3)  there has been an increase in the hazard covered by this policy that is within "your" control and that would produce a rate increase; or

    4)  the department has determined that continuation of the policy would result in a violation of the Texas Insurance Code or any other law governing the business of insurance in the state.

    "We" will give "you" notice at least 10 days before cancellation is effective.

    d.  If "we" do not renew this policy, "we" will give "you" notice at least 30 days before nonrenewal is effective. "We" may nonrenew for any reason except that, under the provisions of the Texas Insurance Code, "we" may not nonrenew solely because "you" are an elected official.

    e.  "Your" return premium, if any, will be calculated on a pro rata basis and will be refunded at the time of cancellation or as soon as practicable. Payment or tender of the unearned premium is not a condition of cancellation.

2.  If this policy has not been issued to a governmental unit, as defined under Texas regulations, under Common Policy Conditions, Cancellation is deleted and replaced by the following:

    **Cancellation And Nonrenewal**

    a.  "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating the date coverage is to stop.

    b.  "We" may cancel or not renew this policy by delivering or mailing written notice to "you" at the address shown in the policy. Such notice may be delivered by electronic means if "you" have affirmatively consented to that method of delivery and have not withdrawn such consent. Proof of delivery or mailing is sufficient proof of notice. The notice will state the reason for cancellation or nonrenewal.

**Page 1 of 2**

Copyright, American Association of Insurance Services, Inc., 2014

**AAIS**
**CL 0273 05 14**

c.  If this policy has been in effect for 60 days or less, "we" may cancel for any reason, except that under the provisions of the Texas Insurance Code, "we" may not cancel this policy solely because "you" are an elected official.

If this policy has been in effect for more than 60 days, or if it is a renewal of a policy issued by "us", "we" may cancel only if one or more of the following reasons apply:

1)  the premium has not been paid when due;
2)  there has been fraud committed in obtaining coverage;
3)  there has been an increase in hazard within "your" control that would produce a rate increase;
4)  there has been a loss of "our" reinsurance covering all or part of the risk covered by this policy; or
5)  "we" have been placed in supervision, conservatorship, or receivership and the cancellation has been approved or directed by the supervisor, conservator, or receiver.

"We" will give "you" notice at least 10 days before cancellation is effective.

d.  If "we" do not renew this policy, "we" will give "you" notice at least 60 days before nonrenewal is effective. "We" may nonrenew for any reason except that, under the provisions of the Texas Insurance Code, "we" may not nonrenew solely because "you" are an elected official.

If such notice is given to "you" later than 60 days before nonrenewal is effective, coverage remains in effect until the 61st day after the date on which the notice is provided. Earned premium for any period of coverage that extends beyond the expiration date of this policy will be computed pro rata based on the rate charged for the expired policy.

The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

e.  "Your" return premium, if any, will be calculated on a pro rata basis and will be refunded at the time of cancellation or as soon as practicable. Payment or tender of the unearned premium is not a condition of cancellation.

**CL 0273 05 14**

Copyright, American Association of Insurance Services, Inc., 2014

Exhibit A to NOR

**AAIS**  
**CL 0700 10 06**  
**Page 1 of 1**

This endorsement changes  
the policy  
**-- PLEASE READ THIS CAREFULLY --**

# VIRUS OR BACTERIA EXCLUSION

## DEFINITIONS

**Definitions Amended** --

When "fungus" is a defined "term", the definition of "fungus" is amended to delete reference to a bacterium.

When "fungus or related perils" is a defined "term", the definition of "fungus or related perils" is amended to delete reference to a bacterium.

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

1. The following exclusion is added under Perils Excluded, item 1.:

   **Virus or Bacteria** --

   "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

a. any contamination by any virus, bacterium, or other microorganism; or

b. any denial of access to property because of any virus, bacterium, or other microorganism.

2. **Superseded Exclusions** -- The Virus or Bacteria exclusion set forth by this endorsement supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

## OTHER CONDITIONS

**Other Terms Remain in Effect** --

The "terms" of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.

**CL 0700 10 06**

Copyright, American Association of Insurance Services, Inc., 2006

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# AMENDATORY ENDORSEMENT
## TEXAS

1. Under Definitions, the following is added:

   "Business Day" means a day other than Saturday, Sunday, or a holiday recognized by the state of Texas.

2. Under Definitions, the definition of "pollutant" is deleted and replaced by the following:

   "Pollutant" means any solid, liquid, gaseous, or thermal irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be disposed of as well as recycled, reclaimed, or reconditioned.

3. Under Perils Excluded, items 3) and 4) of Defects, Errors, and Omissions are deleted.

4. Under Perils Excluded, Increased Hazard is deleted and replaced by the following:

   **Increased Hazard** -- "We" do not pay for loss occurring while the hazard has been increased if such increase in hazard is not usual and incidental to the described occupancy. This exclusion only applies to fire losses.

5. Under Perils Excluded, Seepage is deleted and replaced by the following:

   **Seepage** -- "We" do not pay for loss caused by, or resulting from, continuous or repeated seepage or leakage from within a plumbing, heating, or air-conditioning system, or domestic appliance that:

   a. results in deterioration, rust, mold, or wet or dry rot; or

   b. occurs over a period of 14 days or more.

6. In the Property Coverage Part, under What Must Be Done In Case Of Loss, the first paragraph of Proof of Loss is deleted and

replaced by the following:

"You" must send "us" "your" signed, sworn proof of loss within 91 days of "our" request on a standard form supplied by "us". "We" must request a signed, sworn proof of loss within 15 days after "we" receive "your" written notice of claim, or "we" waive "our" right to require proof of loss. Such waiver will not waive "our" rights under this policy. The proof of loss must include the following information:

7. In the Property Coverage Part, under What Must Be Done In Case Of Loss, Records is amended to include the following:

   "You" will not be required, as a condition of settling a claim, to produce "your" federal income tax returns unless:

   a. "you" have been ordered to produce such tax returns by a court; or

   b. the claim involves:

      1) a fire loss; or
      2) a loss of profits or income.

8. In the Crime Coverage Part, if applicable, under What Must Be Done In Case Of Loss, the first paragraph of Proof of Loss For Crime Coverage is deleted and replaced by the following:

   "You" must send "us" "your" signed, sworn proof of loss within 120 days of "our" request on a standard form supplied by "us". "We" must request a signed, sworn proof of loss within 15 days after "we" receive "your" written notice of claim, or "we" waive "our"

**Page 1 of 4**

**AAIS**
**CO 0314 01 12**          Copyright, American Association of Insurance Services, Inc., 2012

right to require proof of loss. Such waiver will not waive "our" rights under this policy. The proof of loss must include the following information:

9.  Under What Must Be Done In Case Of Loss, the following provision is added:

    **Our Duties** -- "Our" duties in the event of loss are as follows:

    a.  Within 15 days after "we" receive "your" written notice of claim, "we" must:

        1)  acknowledge receipt of the claim. If "our" acknowledgment of the claim is not in writing, "we" will keep a record of the date, method, and content of "our" acknowledgment;
        2)  begin any investigations of the claim; and
        3)  specify the information "you" must provide in accordance with What Must Be Done In Case Of Loss.

        "We" may request more information, if during the investigation of the claim such additional information is necessary.

    b.  After "we" receive the information "we" request, "we" must notify "you" in writing whether "your" claim will be paid or has been denied or whether more information is needed:

        1)  within 15 "business days"; or
        2)  within 30 days if "we" have reason to believe the loss resulted from arson.

    c.  If "we" do not approve payment of "your" claim or need more time for processing "your" claim, "we" must:

        1)  give the reasons for denying "your" claim; or
        2)  give the reasons "we" require more time to process "your" claim. But, "we" must either approve or deny "your" claim within 45 days after requesting more time.

10. Under Valuation, the following provision is added:

    **Total Loss** -- In accordance with Texas Insurance Code Section 862.053, a fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy. The provisions of this section shall not apply to personal property.

11. Under Loss Payment, the last paragraph of Our Options is deleted and replaced by the following:

    "We" will give "you" notice of our intentions when "we" notify "you" of the status of "your" claim.

12. Under Loss Payment, Your Losses is deleted and replaced by the following:

    **Your Losses** -- "We" will adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

    If "we" notify "you" that "we" will pay "your" claim, or part of "your" claim, "we" must pay within five "business days" after "we" notify "you".

    If payment of "your" claim or part of "your" claim requires the performance of an act by "you", "we" must pay within five "business days" after the day "you" perform the act.

13. Under Other Conditions, Restoration of Limits is deleted and replaced by the following:

    **Restoration of Limits** -- Any payment "we" make under the Commercial Output Program coverage for loss to real property by fire will reduce the "limit" applicable to that real property by the amount of such loss. As repairs are made, the amount reduced will be reinstated to the extent of the value of the repairs. The reinstatement will not increase the specified "limits" of insurance.

**Page 2 of 4**

**AAIS**
**CO 0314 01 12**          Copyright, American Association of Insurance Services, Inc., 2012

Except as indicated above or with respect to the Supplemental Coverages - Pollutant Cleanup and Removal and Supplemental Marine Coverages - Virus and Hacking Coverage, no other loss "we" pay under this policy will reduce the "limits" applying to a later loss.

14. Under Other Conditions, item b. of Suit Against Us is deleted and replaced by the following:

   b.   the suit has been brought within two years and one day from the date the cause of action first accrues.

        If any applicable law makes this limitation invalid, the suit must begin within the shortest period permitted by the law.

15. Under Other Conditions, the following condition is added:

   **Premiums** -- The premium shown on the "schedule of coverages" was computed based on rates in effect at the time the policy was issued.

   Undeclared exposures or change in "your" business operation, acquisition, or use of locations may occur during the policy period that are not shown on the "schedule of coverages". If so, "we" may require an additional premium. That premium will be determined in accordance with "our" rates and rules then in effect.

16. Under Other Conditions, Mortgage Provisions is deleted and replaced by the following:

   **Mortgage Provisions** -- If a mortgagee (mortgage holder) is named in this policy, loss to Building Property shall be paid to the mortgagee and "you" as their interest appears. If more than one mortgagee is named, they shall be paid in order of precedence.

The insurance for the mortgagee continues in effect even when "your" insurance may be void because of "your" acts, neglect, or failure to comply with the coverage "terms". The insurance for the mortgagee does not continue in effect if the mortgagee is aware of changes in ownership or substantial increase in risk and does not notify "us" or if the mortgagee does not submit a signed, sworn proof of loss within 91 days after receiving notice from "us" of "your" failure to submit a signed, sworn proof of loss.

If "we" cancel this policy, "we" notify the mortgagee at least 14 days before the effective date of cancellation if "we" cancel for "your" nonpayment of premium, or 30 days before the effective date of cancellation if "we" cancel for any other reason.

If "you" cancel this policy, "we" will notify the mortgagee at least ten days before the date cancellation takes effect.

"We" may request payment of the premium from the mortgagee, if "you" fail to pay the premium.

If "we" pay the mortgagee for a loss where "your" insurance may be void, the mortgagee's right to collect that portion of the mortgage debt from "you" then belongs to "us". This does not affect the mortgagee's right to collect the remainder of the mortgage debt from "you".

As an alternative, "we" may pay the mortgagee the remaining principal and accrued interest in return for a full assignment of the mortgagee's interest and any instruments given as security for the mortgage debt.

If "we" choose not to renew this policy, "we" give written notice to the mortgagee at least ten days before the expiration date of this policy.

**Page 3 of 4**

**AAIS**
**CO 0314 01 12**        Copyright, American Association of Insurance Services, Inc., 2012

17. Under Other Conditions, the following condition is added:

**Catastrophe Claims** -- If a claim results from a weather-related catastrophe or a major natural disaster, each claim handling deadline shown under What Must Be Done In Case Of Loss and Loss Payment is extended for an additional 15 days.

A catastrophe or major natural disaster is a weather-related event which is declared a disaster under the Texas Disaster Act of 1975 or is determined to be a catastrophe by the Texas Department of Insurance.

18. Under Other Conditions, the following is added:

**Bankruptcy** -- Bankruptcy or insolvency of "you" or "your" estate will not relieve "us" of "our" obligations under any legal liability coverage for loss or damage to property of others that is in "your" care, custody, or control and is caused by an "accident" to "covered equipment".

19. In the Equipment Breakdown Coverage Part, if applicable, under Coverage Extensions, item f. of Defense Costs, is deleted and replaced by the following:

f.   Interest that is awarded against "you" before the entry of a judgment. If "we" make an offer to pay the applicable "limit" of insurance, "we" will not pay any prejudgment interest based on that period of time after the offer.

Page 4 of 4

**AAIS**
**CO 0314 01 12**               Copyright, American Association of Insurance Services, Inc., 2012

Exhibit A to NOR

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

**Page 1 of 1**

         © Insurance Services Office, Inc., 2015         Exhibit A to NOR

COMMERCIAL INLAND MARINE
CM 00 01 09 04

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. Abandonment

There can be no abandonment of any property to us.

### B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. Duties In The Event Of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

**1.** Notify the police if a law may have been broken.

**2.** Give us prompt notice of the loss or damage. Include a description of the property involved.

**3.** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**4.** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**5.** You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

**6.** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**7.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**8.** Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**9.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

**10.** Cooperate with us in the investigation or settlement of the claim.

### D. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### E. Loss Payment

**1.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**2.** We will not pay you more than your financial interest in the Covered Property.

**3.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**4.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

   © ISO Properties, Inc., 2003   Exhibit A, Page 1 of 3

**5.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

    **a.** We have reached agreement with you on the amount of the loss; or

    **b.** An appraisal award has been made.

**6.** We will not be liable for any part of a loss that has been paid or made good by others.

**F. Other Insurance**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**G. Pair, Sets Or Parts**

**1. Pair Or Set**

In case of loss or damage to any part of a pair or set we may:

    **a.** Repair or replace any part to restore the pair or set to its value before the loss or damage; or

    **b.** Pay the difference between the value of the pair or set before and after the loss or damage.

**2. Parts**

In case of loss or damage to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**H. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**I. Reinstatement Of Limit After Loss**

The Limit of Insurance will not be reduced by the payment of any claim, except for total loss or damage of a scheduled item, in which event we will refund the unearned premium on that item.

**J. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property.

**2.** After a loss to your Covered Property only if, at time of loss, that party is one of the following:

    **a.** Someone insured by this insurance; or

    **b.** A business firm:

        **(1)** Owned or controlled by you; or

        **(2)** That owns or controls you.

This will not restrict your insurance.

**GENERAL CONDITIONS**

**A. Concealment, Misrepresentation Or Fraud**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. Control Of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all the terms of this Coverage Part; and

**2.** The action is brought within 2 years after you first have knowledge of the direct loss or damage.

**D. No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**E. Policy Period, Coverage Territory**

We cover loss or damage commencing:

**1.** During the policy period shown in the Declarations; and

**2.** Within the coverage territory.

**F. Valuation**

The value of property will be the least of the following amounts:

**1.** The actual cash value of that property;

**2.** The cost of reasonably restoring that property to its condition immediately before loss or damage; or

**3.** The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

**1.** We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which make insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

**1.** Is responsible for the payment of all premiums; and

**2.** Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc.,  1998 Exhibit A Page 3 of 1 □

COMMERCIAL INLAND MARINE
CM 01 12 09 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

**A.** Loss Condition **B. Appraisal** in the Commercial Inland Marine Conditions is replaced by the following:

**B. Appraisal**

**1.** If we and you disagree on the value of the property or the amount of loss, either may make written demand, within 60 days after our receipt of a signed, sworn proof of loss, for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

**2.** If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Inland Marine Condition; and

**b.** We will still retain our right to deny the claim.

**B.** Paragraph **8.** of Loss Condition **C. Duties In The Event Of Loss** in the Commercial Inland Marine Conditions is replaced by the following:

**8.** Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**C.** Paragraph **2.** of General Condition **C. Legal Action Against Us** in the Commercial Inland Marine Conditions is replaced by the following:

**2.** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

**D.** Paragraphs **A.5.a.** and **A.5.b.** of the **Coverage Extensions** and Section **F. Definitions** in the Equipment Dealers Coverage Form are deleted.

Page 1 of 1

 © Insurance Services Office, Inc., 2012 Exhibit A to NOR

IL 01 71 09 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES – LOSS PAYMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART

**A. Loss Payment**

1. With respect to the Crime And Fidelity Coverage Part and Equipment Breakdown Coverage Part, the following conditions are added.

2. With respect to the Commercial Inland Marine Coverage Part, the following conditions replace Item **E. Loss Payment** in the Commercial Inland Marine Loss Conditions:

   **a. Claims Handling**

   (1) Within 15 days after we receive written notice of claim, we will:

      (a) Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

      (b) Begin any investigation of the claim; and

      (c) Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

   (2) We will notify you in writing as to whether:

      (a) The claim or part of the claim will be paid;

      (b) The claim or part of the claim has been denied, and inform you of the reasons for denial;

      (c) More information is necessary; or

      (d) We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

   We will provide notification, as described in **(2)(a)** through **(2)(d)** above, within:

      (i) 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

      (ii) 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

   If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

Page 1 of 2

© ISO Properties, Inc., 2006   Exhibit A to NOR

**b.** We will pay for covered loss or damage within 5 business days after:

  **(1)** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

  **(2)** An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this policy, we will make payment within 5 business days after the date you have complied with such terms.

**c. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **a.** and **b.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which is:

  **(1)** Declared a disaster under the Texas Disaster Act of 1975; or

  **(2)** Determined to be a catastrophe by the State Board of Insurance.

**d.** The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**B.** With respect to the Commercial Inland Marine Coverage Part the following is added:

We will not be liable for any part of a "loss" that has been paid or made good by others.

**Page 2 of 2**

© ISO Properties, Inc., 2006

# TEXAS CHANGES –
# CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    COMMERCIAL CRIME COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    FARM COVERAGE PART – LIVESTOCK COVERAGE FORM
    FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM

**A.** The following is added to Paragraph **2.** of the **Cancellation** Common Policy Condition:

We may cancel this policy for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**B.** The following condition is added:

**NONRENEWAL**

We may elect not to renew this policy except, that under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

AAIS
CL 0600 01 15

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# CERTIFIED TERRORISM LOSS

1.  The following definitions are added.

    a.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

        1)  to be an act of terrorism;
        2)  to be a violent act or an act that is dangerous to human life, property, or infrastructure;
        3)  to have resulted in damage:

            a)  within the United States; or
            b)  to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

        4)  to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and
        5)  to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

    b.  "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2.  The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

    This exclusion does not apply to "certified terrorism loss".

3.  The following provision is added.

    If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4.  The following provisions are added.

    a.  Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1)  exclusions that address war, military action, or nuclear hazard; or
        2)  any other exclusion; and

    b.  the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1)  exclusions that address war, military action, or nuclear hazard; or
        2)  any other exclusion.

**Page 1 of 1**

CL 0600 01 15

Copyright, American Association of Insurance Services, Inc., 2015

Exhibit A to NOR

# COMMERCIAL OUTPUT PROGRAM
# PROPERTY COVERAGE PART

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Commercial Output Program. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

## DEFINITIONS

1. The words "you" and "your" mean the persons or organizations named as the insured on the "schedule of coverages".

2. The words "we", "us", and "our" mean the company providing this coverage.

3. "Accident" means direct physical loss as follows:
   a. mechanical breakdown;
   b. rupturing or bursting of moving parts of machinery caused by centrifugal force;
   c. loss caused by arcing or electrical currents other than lightning;
   d. explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control;
   e. loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment; or
   f. loss to hot water boilers or heaters caused by any condition or occurrence within such equipment.

4. "Business" means the usual business operations occurring at "covered locations" including the tenantability of "covered locations" when the selected coverage option includes "rents".

5. "Computers" means:
   a. "hardware" owned by "you" or in "your" care, custody, or control; or
   b. "software".

6. "Computer hacking" means an unauthorized intrusion by an individual or group of individuals, whether employed by "you" or not, into a "computer", a Web site, or a "computer" network and that results in but is not limited to:
   a. deletion, destruction, generation, or modification of "software";
   b. alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";
   c. observation, scanning, or copying of "data records", "programs and applications", and "proprietary programs";

Copyright, American Association of Insurance Services, Inc., 2002

d.  damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

e.  denial of access to or denial of services from "computers", "computer" network, or Web site including related "software".

7.  "Computer virus" means the introduction into a "computer", "computer" network, or Web site of any malicious, self-replicating electronic data processing code or other code and that is intended to result in, but is not limited to:

a.  deletion, destruction, generation, or modification of "software";

b.  alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";

c.  damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

d.  denial of access to or denial of services from "computers", "computer" network, or Web site including related "software".

8.  "Covered equipment", unless otherwise specified in a schedule, means equipment:

a.  that generates, transmits, or utilizes energy; or

b.  which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

Such equipment must be covered property, except as specifically provided for under Utility Service Interruption coverage and the Spoilage Coverage Part.

"Covered equipment" does not mean:

a.  equipment manufactured by "you" for sale;

b.  buildings, structures, or compartments that cover or house "covered equipment";

c.  foundations that support "covered equipment";

d.  sewage and other underground piping and vessels, water piping, or sprinkler system piping. However, "we" cover:

1)  boiler feedwater and condensate return piping; and

2)  water piping for heating, air conditioning, or refrigeration systems;

e.  "mobile equipment", including but not limited to draglines or other excavation equipment;

f.  aircraft or watercraft and their motors, equipment, and accessories;

g.  automobiles, motor trucks, tractors, trailers, and similar conveyances and their motors, equipment, and accessories. However, any property that is stationary, permanently installed at a "covered location", and receives electrical power from an external power supplier will not be considered an automobile, motor truck, tractor, or trailer; or

h.  "computers".

9.  "Covered location" means any location or premises where "you" have buildings, structures, or business personal property covered under this coverage.

However, if the Scheduled Locations Endorsement is added to this policy, "covered location" means a location that is described on the Location Schedule.

"Covered location" does not mean vehicles containing covered property, except vehicles on or within 1,000 feet of the premises of any covered building or structure.

Copyright, American Association of Insurance Services, Inc., 2002

**AAIS**
**CO 1000 10 02**
**Page 3 of 31**

10. "Data records" means files, documents, and information in an electronic format and that are stored on "media".

11. "Dependent locations" means locations that are operated by others and that "your" "business" depends on, as described below. Dependent locations includes but is not limited to:
   a. contributing locations, these are "your" suppliers' locations or locations of suppliers that deliver services or materials to others for "your" account. Contributing locations do not include suppliers of:
      1) water;
      2) telecommunications, including but not limited to Internet service providers; or
      3) power;
   b. recipient locations, these are locations that receive "your" products;
   c. leader locations, these are locations that attract customers to "your" "business"; or
   d. manufacturing locations, these are locations that make products for delivery to "your" customers under contract of sale.

12. "Fine arts" means bona fide works of art of rarity, historical value, or artistic merit, including but not limited to paintings, etchings, pictures, tapestries, and art glass windows.

13. "Flood" means flood, surface water, waves, tidal water, or the overflow of a body of water, all whether driven by wind or not. This includes spray that results from any of these whether driven by wind or not.

14. "Hardware" means a network of electronic machine components (microprocessors) capable of accepting instructions and information, processing the information according to the instructions, and producing desired results. "Hardware" includes but not limited to:

   a. mainframe and mid-range computers and servers;
   b. personal computers and workstations;
   c. laptops, palmtops, notebook PCs, other portable computer devices and accessories including, but not limited to, multimedia projectors; and
   d. peripheral data processing equipment, including but not limited to, printers, keyboards, monitors, and modems.

15. "Limit" means the amount of coverage that applies.

16. "Media" means an instrument that is used with "hardware" and on which "data records", "programs and applications", and proprietary programs can be recorded or stored. "Media" includes, but is not limited to, films, tapes, cards, discs, drums, cartridges, cells, DVDs, or CD-ROMs.

17. "Mobile equipment" means:
   a. contractors' equipment or similar equipment of a mobile or floating nature;
   b. self-propelled vehicles designed and used primarily to carry mounted equipment; or
   c. vehicles designed for highway use that are unlicensed and not operated on public roads.

18. "Money" means currency, bullion, coins, bank notes in current use, and traveler's checks, register checks, and money orders held for sale to the public.

19. "Off-site server" means a server for "your" Web site that is being maintained or operated by and that is located at the premises of:
   a. an independent contractor acting as "your" Web host; or
   b. "your" Internet service provider that is acting as "your" Web host.

Copyright, American Association of Insurance Services, Inc., 2002