United States District Court
Southern District of Texas

**ENTERED**

January 31, 2020

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ALLEY THEATRE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-19-1987 |
| | § | |
| HANOVER INSURANCE CO., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This is a post-Hurricane Harvey first-party property-damage insurance dispute over policy coverage and amounts for flood damage to Houston's downtown repertory theater, the Alley Theatre.  Insurance disputes are rarely connected to the stuff of drama.  The most famous[1] drama is probably "Double Indemnity."  That film did not deal with property damage, the more mundane side of the insurance business.  But when, as here, the property-insurance dispute arises from a major hurricane that disrupted large parts of a huge city and destroyed much of its major repertory theater, the case acquires dramatic value.

The parties have cross-moved for partial summary judgment, presenting three issues: (1) whether the Alley's claim of lost-business income is subject to the Policy's $3 million Flood Endorsement Limit or to the $5 million Income Coverage Limit; (2) whether water damage caused by a sprinkler system that was broken when an interior wall collapsed due to the storm flood waters is subject to the Policy's $3 million Flood Endorsement Limit or to the almost $157 million

---

[1] A lesser known work is "Insurance: The Musical," described as "Mama Mia meets West Side Story meets C.S.I. with plenty of greed, corruption, sex, bureaucracy, and dancing."  It was "no Lion King," but "surprisingly entertaining."  The musical was dreamed up by *Insurance Journal* on April Fool's Day. *See* Art Moron, *"Insurance: The Musical" Opens on Broadway*, INSURANCE JOURNAL (April 1, 2014), https://www.insurancejournal.com/news/national/2014/04/01/324988.htm.

Catastrophe Limit; and (3) whether the $3 million Flood Endorsement Limit applies if the damage was caused by a named storm, such as "Hurricane Harvey," or whether it is the Catastrophe Limit that applies.

Based on the complaint, the motions and responses, the summary judgment record, the applicable law, and oral arguments of counsel, the court grants the Alley's motion in part and denies it in part, and grants Hanover's motion in part and denies it in part.  The court finds that, based on the facts taken as undisputed for this motion, as a matter of law:

(1) the Policy's $3 million Flood Endorsement Limit does not apply to the Income Coverage Part;

(2) flood was a proximate cause of the sprinkler-system leak  and damage, making the Policy's $3 million Flood Endorsement Limit applicable to those damages; and

(3) the Named Storm Deductible Endorsement does not create a separate covered peril, making the Policy's Flood Endorsement Limit applicable to direct physical loss caused by flood, even if the loss resulted from a named storm.

As a result, the $5 million Income Coverage Limit applies to the lost-business income claim; the $3 million Flood Endorsement Limit applies to the sprinkler-system leak claim; and the fact that the storm had a name does not alter the Flood Endorsement's coverage.

The reasons for these rulings are set out below.

## I.   Background

Hurricane Harvey hit the greater Houston area on August 25, 2017, causing extensive damage throughout the region.  (Docket Entry No. 13 at 2).  The Alley Theatre, located in downtown Houston, suffered severe flooding.  (*Id.* at 3).  The Alley alleges, that as flood water filled its basement, the water broke an interior concrete wall that, as it fell, hit and ruptured a fire-

suppression sprinkler pipe, releasing nearly a million gallons of sprinkler-system water into the basement. (*Id.*). The Alley had to stop its operations for several months and spend over $12 million to repair the theater. (Docket Entry No. 13 at 3–4). Hanover accepts these facts as true for the purposes of this motion. (Docket Entry No. 18-1 at 13).

The Alley was insured under an all-risk commercial-property insurance Policy, No. RHD 7499912 13, issued through the Hanover Insurance Company. (Docket Entry No. 13-2). The Policy's Schedule of Coverages has a $156,890,000 Catastrophe Limit, defined as "[t]he most [Hanover] will pay for any combination of or total of losses arising under one or more coverages in any one occurrence." (*Id.* at 11). The Schedule lists five coverage parts: Property; Income; Flood; Earthquake; and Optional Coverages and Endorsements. (*Id.* at 11–16).

The Policy covers "risks of direct physical loss unless the loss is limited or caused by a peril that is excluded." (*Id.* at 59). The Policy excludes "loss or damage caused directly or indirectly by one or more of the following excluded causes or events." (*Id.*). Flood is listed as an excluded peril, except that the Policy does "cover the resulting loss if fire, explosion, or sprinkler leakage results." (*Id.* at 61). The Policy also contains a separate Flood Endorsement that overrides the excluded peril language on flood. (*Id.* at 82). The Flood Endorsement provides blanket flood coverage, limited to $3 million per occurrence, for "direct physical loss to covered property at 'covered locations' caused by 'flood.'" (*Id.* at 15, 82). Flood is defined as "flood, surface water, waves, tidal water, or the overflow of a body of water, all whether driven by wind or not. This includes spray that results from any of these whether driven by wind or not." (*Id.* at 45).

The Income Coverage Part has a coverage limit of approximately $5 million for coverage "during the 'restoration period' when 'your' 'business' is necessarily wholly or partially interrupted by direct physical loss of or damage to property at a 'covered location.'" (*Id.* at 14,

3

74).  The Income Coverage Part provides that its coverage "is also subject to the 'terms' and conditions in the Commercial Output Program – Property Coverage Part under the sections titled Agreement, Definitions, Property Not Covered, Perils Covered, Perils Excluded, What Must Be Done In Case of Loss, Loss Payment, and Other Conditions."  (*Id.* at 74).

The Policy contains a Named Storm Deductible Endorsement as part of the Commercial Output Program.  The Endorsement creates a one percent deductible and imposes a 96-hour waiting period for business income and extra-expense recovery when the damage results from a named storm.  (*Id.* at 23).

After Hurricane Harvey hit, the Alley notified Hanover of the damage and worked closely with Hanover throughout the repair process.  (Docket Entry No. 13 at 3).  Hanover paid almost $7 million for the Alley's claim, including the $3 million required under the Flood Endorsement.  (Docket Entry No. 14-2).  Hanover denied its obligation to pay additional sums for business-interruption losses or for "property damage covered as sprinkler leakage and named storm in the property coverage part."  (Docket Entry No. 13 at 3).

The Alley sued Hanover in Texas state court, asserting claims for breach of contract, breach of the Texas Insurance Code, and bad faith.  (Docket Entry No. 1-A).  Hanover timely removed, and the Alley filed its first amended complaint, which added a request for declaratory judgment.  (Docket Entry No. 1; Docket Entry No. 4).  The parties cross-moved for summary judgment on the legal issues of contract interpretation governing which limits apply.  (Docket Entry No. 9).

The summary judgment record includes the Alley's insurance policy; the National Hurricane Center report on Hurricane Harvey; a National Public Radio story on Hurricane Harvey; an American Theatre report on Hurricane Harvey damage in Houston; the Alley's "Update on Harvey Recovery"; information on the sprinkler leak; photos of the Alley's damage;

4

correspondence between the Alley's counsel and Hanover's counsel about the Alley's lost-business income; and the declaration of Andrew Norris, Hanover's Major Case Unit Manager of Marine Claims.  (*See* Docket Entry No. 13-1; *see* Docket Entry No. 14-1).

The parties' arguments are described in detail below.

## II.     The Legal Standards

### A.     Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial.'"  *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  The moving party must demonstrate the absence of a genuine issue of material fact, but it need not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).   "If the moving party fails to meet [its] initial burden, [the

summary judgment motion] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).   The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).   "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019).   In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

### B.     The Interpretation of Insurance Contracts

Under Texas law, insurance contracts are interpreted under the general rules of contract construction, "and words and phrases contained therein should be given their plain and ordinary meaning." *See Aggreko, L.L.C. v. Chartis Specialty Ins. Co.*, 942 F.3d 682, 688 (5th Cir. 2019) The court interprets an insurance contract to "effectuate the intent of the parties at the time the contracts were formed." *Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co.*, 866 F.3d 254, 258 (5th Cir. 2017) (quoting *Mid–Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 212 (5th Cir. 2009)).

The interpretation of an insurance contract is a legal determination. *See Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 238 (5th Cir. 2016).   If an insurance policy is worded so

that it can be given only one reasonable construction, it will be enforced as written.  *John M. O'Quinn, P.C. v. Lexington Ins. Co.*, 906 F.3d 363, 367 (5th Cir. 2018) (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).  Only when an insurance contract is susceptible to more than one reasonable interpretation may the court resort to the rule requiring adoption of the interpretation most favorable to the insured.  *Id.*  The fact that the parties disagree as to whether there is coverage or the extent of coverage does not create an ambiguity.  *Indem. Ins. Co. of N. Am. v. W & T Offshore, Inc.*, 756 F.3d 347, 352 (5th Cir. 2014) (internal quotation omitted).  Nor may extrinsic evidence be admitted for the purpose of creating an ambiguity.  *Liberty Mut. Ins. Co. v. Servisair, L.L.C.*, 698 F. App'x 770, 773 (5th Cir. 2017).

When an insurance contract is not subject to challenge for ambiguity, its interpretation is a question of law for the court, appropriate for summary judgment.  *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 842 (5th Cir. 2012) (quoting *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004)).  In a suit to recover on an insurance contract, the insured bears the initial burden of showing that there is coverage, while the insurer has the burden of proof as to "the applicability of any exclusions in the policy."  *O'Quinn*, 906 F.3d at 367 (quoting *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998)).  Language of a policy exclusion or exception to coverage that the insurer claims constitutes an avoidance or an affirmative defense.  *See* TEX. INS. CODE § 554.002.  If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim is within an exception to the exclusion.  *See Vic Mfg. Co.*, 143 F.3d at 193.  A court applying the law of a particular state does not limit itself to the cases decided under that law if the contract provisions at issue are identical.  *Apache Corp. v. Great Am. Ins. Co.*, 662 F. App'x 252, 255 (5th Cir. 2016).

### III.   Analysis

The Alley argues that the court should determine whether the construction it advanced is reasonable, resolving any uncertainty in its favor.   (Docket Entry No. 13 at 5–6).   But this interpretive canon applies only when the contract is ambiguous.   *O'Quinn*, 906 F.3d at 367.   At oral argument, the parties agreed that the Policy is not ambiguous.   (Docket Entry No. 23).   The Policy's interpretation is a question of law for the court to determine, based on the Policy language. *See ACE*, 699 F.3d at 842.

### A.   Is the Lost-Business Income Claim Subject to the Flood Endorsement Limit?

The Alley argues that the Income Coverage Part is not subject to the Flood Endorsement Limit, but instead to the $5 million Income Coverage Limit.   (Docket Entry No. 13 at 6).   The Alley argues that the language of the Flood Endorsement states that it applies to "direct physical loss to covered property."   (*Id.*; *see* Docket Entry No. 13-2 at 82).   The Income Coverage Part, by contrast, applies to the loss of earnings and extra expense when the insured's "business is necessarily wholly or partially interrupted by direct physical loss of or damage to property at a covered location."   (Docket Entry No. 13-2 at 74 (internal quotations omitted)).   The Alley's interpretation respects the Policy's structure, which separates each coverage part and each coverage limit.   (Docket Entry No. 13 at 9–11).

Hanover responds that the Alley's interpretation is unreasonable because it ignores the plain Policy language.   (Docket Entry No. 14 at 9).   Hanover argues that the Flood Endorsement limits recovery for lost income caused by flood.   (Docket Entry No. 14 at 7–8).   Hanover points out that the blanket flood coverage language—"loss caused by 'flood'"—is broad enough to encompass both property and lost-business income damages.   (*See* Docket Entry No. 13-2 at 82). Hanover argues that this is supported by the Income Coverage Part's incorporation of other

conditions: "Other 'terms' relating to How Much We Pay also apply.  These 'terms' are described

in the Commercial Output Program – Property Coverage Part."  (Docket Entry No. 13-2 at 79).

Under Hanover's reading of the Policy, the Income Coverage Part is "subject to" all of the terms

in the Property Coverage Part, which includes the $3 million Flood Endorsement Limit.  (Docket

Entry No. 18-1 at 3).

  The Alley responds that "the Income Coverage Part is only subject to specifically

enumerated sections of the Property Coverage Part—and the Flood Endorsement is not one of

them."  (Docket Entry No. 16 at 7).  But even incorporating the Flood Endorsement Part, the Alley

argues that the Flood Endorsement does not cover all losses caused by flood, but only "direct

physical loss to covered property . . . caused by 'flood.'"  (Docket Entry No. 16 at 1).

  Hanover responds that "direct physical loss to covered property" has no meaning in the

Policy, but serves only as a "triggering condition."  (Docket Entry No. 18-1 at 7).  Hanover cites

COUCH ON INSURANCE, which explains,

> As with any insurance, property insurance coverage is 'triggered' by some
> threshold concept of injury to the insured property. . . . Under most coverages,
> however, the policy specifically ties the insurer's liability to the covered peril
> having some specific effect on the property. In modern policies, especially of the
> all-risk type, this trigger is frequently "physical loss or damage" but may be any of
> several variants focusing on "injury," "damage," and the like."

Daniel Maldonado, 10A COUCH ON INSURANCE § 148:46 (3d 2019).  The Alley responds that the

"insurer's liability" is to insure "Covered Property," which means "Covered Building Property"

and "Covered Building Personal Property."  (Docket Entry No. 16 at 3–4).  The Alley notes that

business-income losses, as intangible losses, are not included in this definition.  (*Id.*).  Hanover

objects, arguing that the Policy "does not assign special meaning to or otherwise define the words."

(Docket Entry No. 18-1 at 7 (emphasis omitted)).  While the Policy does not define "covered

property," it does include a section entitled "Property Covered," which provides that Hanover

9

covers "the following property unless the property is excluded or subject to limitations." (Docket Entry No. 13-2 at 48). The provision has two subparts—Building Property and Building Personal Property. (*See* Docket Entry No. 13-2 at 48–49). The Policy defines "covered property" to mean covered building property and covered building personal property.

The Alley also argues that if the Flood Endorsement was intended to also limit business-interruption damages caused by flood, the Policy language could have said so. (Docket Entry No. 13 at 8–9). The Alley points to the Limited Fungus and Related Perils Coverage Part, which amends the "[c]overage provided under the Income Coverage Part" to provide its own income coverage "for earnings and/or extra expense caused by 'fungus or related perils.'" (Docket Entry No. 13-2 at 91). The Theatrical Property Floater also refers to extra expenses in the event of business interruption caused by physical property damage. (*Id.* at 98). The Flood Endorsement, in contrast, does not mention income coverage or business-interruption losses.

The Alley's interpretation gives effect to the Policy as a whole, considering its overall structure. Each part of the Policy, including the Property Coverage Part, covers a different risk of loss, described by each part's "Perils Covered," and different Parts contain different limits that apply to that type of loss. These limits do not apply to other losses not covered by that Part. To apply the Flood Endorsement Limit to losses caused by flood, but not covered by the Flood Endorsement, would give the Flood Endorsement Limit a broader scope than the Flood Endorsement's coverage. This is consistent with the fact that the Flood Endorsement does not refer to the Income Coverage Part.

Hanover is correct that the Policy must be interpreted as a whole and that the Income Coverage Part is subject to the Property Coverage Part's terms and conditions. But the Income Coverage Part's incorporated terms do not mention coverage limits. (*See* Docket Entry No. 13-2

at 43–73).  The Alley's interpretation does not ignore the provision making the Income Coverage Part subject to other terms and conditions, but rather applies those terms and conditions.  Hanover's interpretation applies the Flood Endorsement Limit to more categories of damage than the Flood Endorsement covers and fails to give effect to the overall Policy structure and language.

Case law also supports the Alley's interpretation.  In *Baylor College of Medicine v. American Guarantee and Liability Insurance Company*, No. H-02-1711, 2002 WL 35644976, at *1 (S.D. Tex. Oct. 30, 2002), this court ruled that an insurance policy's flood-endorsement limit did not apply to business-interruption losses caused by flooding from Tropical Storm Allison.  The parties disagreed over whether a $50 million flood-endorsement limit applied to lost-business income caused by flood.  *Id.*  The flood endorsement extended coverage to "direct physical loss or damage to Covered Property caused by flood" and limited payment to "all flood loss or damage for all Premises combined in any one policy year."  *Id.* at *3.  The policy's declarations page stated that "as an endorsement sublimit, the Flood sublimit [applied] 'in addition' to the Extensions of Coverage Limits of Insurance," which provided a separate limit for lost-business income.  *Id.* at *6.  Business income coverage was defined as "'actual' loss of Business Income sustained 'from the necessary suspension of your operations due to direct physical loss or damage during the period of restoration.'"  *Id.* at *2.

In *Baylor*, this court found that the two coverage parts "reflect the distinction, recognized in the cases, between direct physical loss or damage to covered property from a covered cause of loss, on the one hand, and, on the other hand, reduction in business income resulting from the suspension of operations during the covered property's restoration."  *Id.* at *6 (collecting cases distinguishing between the two types of coverage).  The court ruled that the flood endorsement limit applied "to *all* flood loss or damage covered by the Flood Endorsement, which is all 'direct

physical loss or damage to Covered Property' due to flood." *Id.* at *7. The court found this conclusion supported by the fact that the flood endorsement was silent on the issue of business-interruption losses, compared to other endorsements that specifically excluded business-income losses. *Id.* at *11.

Here, as in *Baylor*, the Policy contains different limits for different categories of losses. As in *Baylor*, the Flood Endorsement's limit applies to "loss caused by 'flood," but the Flood Endorsement covers only "direct physical loss . . . caused by 'flood.'" As in *Baylor*, the Income Coverage Part covers loss of earnings and extra expenses from business interruption. As in *Baylor*, the Flood Endorsement's limit does not apply to losses it does not cover.

Hanover argues that the "in addition to" language in the *Baylor* policy was central to the court's holding. (Docket Entry No. 14 at 11–12). But Hanover reads that opinion too narrowly. The court concluded that Baylor's interpretation—that each limit applied to a different category of loss—gave effect to the policy as a whole. *Baylor*, 2002 WL 35644976, at * 7. While the "in addition to" language played a role in the analysis, it did not alter the meaning of the business-income coverage language, which covered only "direct physical loss."

Other courts reach similar results. In *Mark Andy, Inc. v. Hartford Fire Insurance Company*, 233 F.3d 1090, 1092 (8th Cir. 2000), the Eighth Circuit found a similar policy to be, at best, ambiguous on the issue of business-interruption losses caused by flooding. The court noted that while the policy's flood endorsement was silent on the issue of business-interruption coverage, another endorsement stated that it did not cover resulting business-interruption losses. *Id.* Because of the policy's ambiguity, the court construed the policy in favor of the insured and held that the flood-endorsement sublimit did not apply to business-interruption losses caused by flood damage. *Id.*

While Hanover correctly argues that *Mark Andy* does not create a blanket rule that a flood-endorsement sublimit that is silent on business-interruption losses cannot apply to flood-related income loss, (Docket Entry No. 14 at 12), the case is still persuasive.  As in *Mark Andy*, other provisions in the Alley's Policy refer to the Income Coverage Part, but the Flood Endorsement does not.  And contrary to Hanover's argument that the Flood Endorsement Limit unambiguously applies to "loss caused by 'flood,'" the Flood Endorsement Limit also unambiguously applies to flood coverage, which is defined as "direct physical loss to covered property."

Hanover cites *Altru Health Systems v. American Protection Insurance Company*, 238 F.3d 961 (8th Cir. 2001), as an example of a court finding that business-interruption losses are subject to flood-endorsement limits.  (Docket Entry No. 14 at 14).  But the *Altru* court examined a different policy.  That policy's preamble stated that "[a]ll liability for loss or expense under this Policy for any one occurrence shall not exceed the smallest of . . . any applicable sublimits of liability entered elsewhere in the Policy."  238 F.3d at 964.  The court noted a "second critical provision" in the flood-coverage section, stating that "all claims for loss, damage or expense arising out of any one Flood occurrence shall be adjusted as one claim."  *Id.*  The court held that because "Altru's business interruption and extra expense losses arose out of the flood, . . . that claim is clearly and unambiguously subject to the $1,500,000 sublimit of liability found in the same Flood Coverage Section."  *Id.*  The court further stated that the policy's preamble "unambiguously subject[ed] all losses caused by a flood, including business interruption and extra expense losses, to the flood sublimit."  *Id.* at 965.

Hanover similarly relies on other cases that involved policies defining flood damage as all loss resulting from flooding, without restriction to direct physical loss to covered property. (Docket Entry No. 14 at 14–16); *see El-Ad 250 W. LLC v. Zurich Am. Ins. Co.*, 13 N.Y.S.3d 68

(N.Y. App. 2015) (the policy defined flood loss as "all losses or damages arising" during a flood); *For Kids Only Child Dev. Ctr., Inc. v. Phila. Indem. Ins. Co.*, 260 S.W.3d 652, 654 (Tex. App.—Dallas 2008) (the policy stated that it would pay for "loss or damage caused by or resulting from flood damage or water," but would "not [pay] more than $25,000 in any one occurrence"); *New Sea Crest Healthcare Ctr., LLC v. Lexington Ins. Co.*, No. 12 CV 6414, 2014 WL 2879839, at *1–2 (E.D. NY Jun. 24, 2014) (the policy contained no reference to physical damage when defining flood damage); *Gilbert/Robinson, Inc. v. Sequoia Ins. Co.*, 655 S.W.2d 581, 583 (Mo. Ct. App. 1983) (the policy made no reference to flood damage as physical loss).

Interpreted to give effect to the Policy as a whole, and considering the case law, the court concludes that the $3 million Flood Endorsement Limit does not apply to lost-business income that results from flood damage. Instead, the $5 million Income Coverage Limit applies. The court grants the Alley's motion for summary judgment on this point.

### B.     Is the Sprinkler-System Damage Subject to the Flood Damage Limit?

The Alley argues that the sprinkler-system leakage damage is not subject to the $3 million Flood Endorsement Limit because sprinkler leakage is not an excluded peril, but rather a covered peril under the Property Coverage Part and is subject to the overall Catastrophe Limit. (Docket Entry No. 13 at 14). The Policy covers "risks of direct physical loss unless the loss is limited or caused by a peril that is excluded." (Docket Entry No. 13-2 at 59). The Policy excludes "loss or damage caused directly or indirectly by one or more of the following excluded causes or events." (*Id.*). The Alley notes that the Policy excludes flood coverage except to "cover the resulting loss if fire, explosion, or sprinkler leakage results." (*Id.* at 61). Even though the Flood Endorsement effectively deletes this provision, the Alley argues that this language evidences the Policy's intent to treat flood and sprinkler-system damage separately. (Docket Entry No. 16 at 15). The Alley

supports this interpretation by noting that the "Specified Perils" definition includes water damage. (*See* Docket Entry No. 13-2 at 47).

Hanover responds that no intent can be inferred from the flood-exclusion language because the Flood Endorsement replaced and deleted its terms.  (Docket Entry No. 14 at 17–18).  Hanover explains that the "specified peril" language does not create coverage, relying on *Praetorian Insurance Company v. Arabia Shrine Center Houston*, No. 4:14-cv-3281, 2016 WL 687564 (S.D. Tex. Feb. 19, 2016).

The Policy language supports the Alley's argument.  The Policy defines "flood" as "flood, surface water, waves, tidal water, or the overflow of a body of water, all whether driven by wind or not.  This includes spray that results from any of these, whether driven by wind or not."  (Docket Entry No. 13-2 at 45).  "Water damage," by contrast, is defined as "the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam."  (*Id.* at 48).  These defined terms show that sprinkler-system leakage is not the same as "flood" under the Policy.  Because sprinkler leakage is a covered peril separate from flood damage, the Property Coverage Part covers the loss.  The Alley's interpretation acknowledges that in some circumstances, depending on the facts, sprinkler-system leakage damage is not "direct physical loss caused by flood" and not limited by the Flood Endorsement.

The parties appear to agree that if the Harvey flood water caused the sprinkler-system leak, the resulting damage is "loss caused by flood" and subject to the $3 million Flood Endorsement Limit.  (Docket Entry No. 23).  As Hanover argues, because the Flood Endorsement Limit applies to "direct physical loss to covered property . . . caused by 'flood,'" and the Alley's sprinkler-system leakage was proximately caused by the Harvey flood waters, the resulting damage is

subject to the $3 million flood limit.  (Docket Entry No. 14 at 17).    Hanover argues that the Hurricane Harvey flood waters "in a natural and continuous sequence produced the concrete wall collapse and resulting broken sprinkler pipe." (*Id.*).  The Alley alleges that the Harvey flood waters weakened a wall in the Alley's basement that collapsed, ruptured the sprinkler system, and made the system leak.  (Docket Entry No. 13 at 3).  In the Alley's view, the wall collapse was an intervening cause of the sprinkler-system rupture and leak.  (Docket Entry No. 24 at 4).  The parties ask the court to decide causation as a question of law because "the evidence is without material dispute and . . . only one reasonable inference may be drawn."  (Docket Entry No. 18-1 at 12 (quoting *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 266 (Tex. App. – Hous. [14th Dist.] 2000); Docket Entry No. 23).

Under Texas law, when an occurrence under an insurance policy is defined to include a series of losses arising from the same event, the occurrence includes those losses proximately caused by that event.  *Seahawk Liquidating Tr. v. Certain Underwriters at Lloyds London*, 810 F.3d 986, 993 (5th Cir. 2016).  The Fifth Circuit explains that "the focus should . . . be 'on the direct, immediate, and proximate cause of the losses to determine the number of occurrences.'" *Evanston Ins. Co. v. Mid-Continent Cas. Co.*, 909 F.3d 143, 150 (5th Cir. 2018) (quoting *Seahawk*, 810 F.3d at 992–93).  Proximate cause is defined as "that cause which in a natural and continuous sequence unbroken by any new and intervening cause, produces a loss, and without which the loss would not have occurred."  *Seahawk*, 810 F.3d at 993 (internal quotation omitted).

Hanover relies on *Allianz Cornhill International v. Great Lakes Chemical Corporation*, No. H-04-1668, 2006 WL 778618 (S.D. Tex. Mar. 24, 2006).  In *Allianz*, the Great Lakes Chemical Corporation filed a business-interruption claim after two ice storms caused it to lose electricity, which damaged equipment.  *Id.* at *1.  The policy insured "against all risks of direct physical loss

or damage to property" and included ice storms as a covered peril. *Id.* at *6–7. The court had to determine whether the ice storm was the proximate cause of the business-interruption losses. *Id.* at *6. The court noted that the "storm itself did not cause" the equipment to fail, but instead that there were "three links in the causation chain leading to the business interruption losses: (1) storms, (2) power outages, and (3) pump failure." *Id.* at *7. The court relied on an older Texas case, which explained that "where, and only where, an insured peril sets other causes in motion which in unbroken sequence and connection produce the final result for which the insured seeks to recover under his policy, the peril insured against will be regarded as the direct and proximate cause of the entire loss." *Id.* (quoting *United States Ins. Co. of Waco v. Boyer*, 269 S.W.2d 340, 343 (Tex. 1954)). The *Allianz* court concluded that "[t]here can be no reasonable doubt, that the ice storm— an insured peril—set in motion other causes which, in unbroken sequence, produced the business interruption losses claimed by" Great Lakes. *Id.*

The Alley disagrees with Hanover's reliance on *Allianz*, arguing that the "fall of the wall into the sprinkler was the proximate cause of this occurrence, rather than the waters from Hurricane Harvey." (Docket Entry No. 24 at 2). The Alley relies on *Stroburg v. Insurance Company of North America*, 464 S.W.2d 827 (Tex. 1971). In *Stroburg*, the beneficiary of an accidental injury and death policy sued the insurer to recover for the death of the named insured as a result of an automobile collision. *Id.* at 827–28. The insurance policy covered specified losses "resulting directly and independently of all other causes from bodily injuries caused by accident," but excluded any loss resulting from illness or disease. *Id.* at 828. The insurance company claimed that the named insured had a bleeding ulcer and emphysema that caused him to have a car accident, in which he died. *Id.* The jury found that neither medical condition caused the accident. *Id.* at 828. The Court of Civil Appeals reversed, but the Texas Supreme Court reversed again. *Id.* at

829.  The Texas Supreme Court held that a jury "could reasonably have concluded from the testimony that the insured's condition of emphysema was so insubstantial in the scale of causation that it did not, in legal contemplation, contribute to cause his death."  *Id.*

The Alley also cites a similar case, *JCPenney Life Insurance Company. v. Baker*, 33 S.W.3d 417 (Tex. App.—Ft. Worth 2000), in which the insured died after driving his car into a lake.  The policy required the insured to have "suffer[ed] a bodily injury caused by an accident 'directly and independently of all other causes.'"  *Id.* at 421.  The insurance company denied coverage because "there was some evidence that [the insured] may have had a coronary problem (i.e., a natural cause) that caused him to lose consciousness and drive into the lake."  *Id.*  The Court of Civil Appeals upheld the jury verdict for the insured's beneficiary, finding that "the jury was clearly entitled to find that the evidence indicating that [the insured] may have had a non-lethal coronary event that may have contributed to the accident was, at best, evidence of a remote rather than proximate cause of [the insured]'s death."  *Id.* at 423.  The Alley argues that the waters from Hurricane Harvey are even more separate and independent from the sprinkler-system rupture than the medical issues that *may* have been contributing causes to the automobile accidents in *Stroburg* and *Baker*.  (Docket Entry No. 24 at 3–4).

The situation here is more similar to *Allianz* than to *Stroburg* or *Baker*.  The parties agree that Hurricane Harvey flood waters filled the Alley's basement and broke the interior concrete wall that fell and ruptured the sprinkler-system pipe.  (Docket Entry No. 13 at 3; Docket Entry No. 18-1 at 13).  While the Alley is correct that the chain of events has several links—(1) the storm, (2) the wall collapse, (3) the sprinkler-pipe rupture, and (4) the sprinkler-system leak and damage—it was the insured peril of the Hurricane Harvey flood waters that began the chain of events in an "unbroken sequence and connection," as in *Allianz*.

18

The two cases the Alley cites are distinguishable.[2]  In both, the court was reviewing a jury verdict in favor of the insured's beneficiary, which requires the court to find "more than a scintilla" of evidence to hold that the jury's verdict was "sufficient as a matter of law."  *Baker*, 33 S.W.3d at 420.  "There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact."  *Id.* at 421.  In contrast, summary judgment is available when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The parties do not dispute the chain of events that led to the wall collapse and sprinkler damage here.

Both of the Alley's cited cases dealt with underlying medical illnesses with only a tenuous connection to the automobile accidents that caused the lawsuits.  Here, accepting the undisputed facts established by the summary judgment evidence, it was Harvey flood water that "broke through the concrete wall" and "hit and broke open a fire suppression sprinkler pipe."  (Docket Entry No. 13 at 3).  Harvey is more similar to the ice storm that cut the electricity and caused the plant's shutdown and damaged the equipment, than to an underlying health issue that may or may not have been linked to the driver's car accident.

---

[2]  At oral argument, the Alley cited two out-of-circuit cases, *Abady v. Hanover Fire Ins. Co.*, 266 F.2d 362 (4th Cir. 1959) and *Williams v. Liberty Mut. Fire Ins. Co.*, 334 Mass. 499 (1956).  In both cases, the courts were faced with insurance policies that covered wind damage, but excluded losses from cold-weather.  In both cases, the insured's property was damaged by a windstorm, which allowed cold air to enter the property, resulting in burst pipes.  In *Abady*, the Fourth Circuit held that the plain meaning of wind damage "connotes damage due to the strength or force of the wind."  266 F.2d at 365.  Because the insured's argument "is not premised on the strength or force of the wind on the pipes but on the chemical or physical properties of moving air in that it will absorb and carry away heat," the court found no legal basis for recovery.  *Id.*  The *Abady* court relied on *Williams*, which dealt with similar facts and reached the same conclusion.  *Id.* at 364.  These cases are distinguishable.  As quoted above, the *Abady* court explained that the resulting damage was not the type of damage the policy intended to cover.  The *Williams* court reached a similar conclusion.  334 Mass. at 912.  In contrast, the Flood Endorsement does not specifically exclude consequential damages, and water damage is the type of loss the Flood Endorsement intended to cover. (*See* Docket Entry No. 13-2 at 82).

The flood from Hurricane Harvey was a proximate cause of the Alley's sprinkler-system rupture and leakage, and the $3 million limit applies to the sprinkler-leak damage.  The court denies the Alley's motion for summary judgment and grants Hanover's motion for summary judgment on this point.

### C.   Does the Flood Endorsement Limit Apply if the Damage was Caused by a Named Storm?

Different coverage parts of the Policy contain different deductibles.  (*Compare* Docket Entry No. 13-2 at 15 *with* Docket Entry No. 13-2 at 16).  The Policy contains a Named Storm Deductible Endorsement, equal to one percent of the total value of the covered property.  (Docket Entry No. 13-2 at 23).  The Named Storm Deductible Endorsement defines "Named Storm," as follows:

> In this endorsement a named storm refers to weather related events given a name or designated by the National Weather Center as such.
>
> The deductible provision under How Much We Pay is replaced by the provisions for Flat Deductible or Percentage Deductible when loss to covered property is caused by or results from a named storm.
>
> Loss or damage resulting from a covered weather condition, other than from a named storm, will be considered part of the named storm occurrence if loss or damage would not have occurred with out the weather conditions from the named storm.

(*Id.* at 23).  The Named Storm Deductible Endorsement states that "[n]othing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements or limitations of the policy other than as above stated."  (*Id.*).

The Named Storm Deductible was not applied to the Alley's claims.[3]  (Docket Entry No. 13 at 18 n.4).  The Alley, while not arguing that the higher deductible should apply, argues that because it exists, a separate coverage part applies to the Alley's claims.  (Docket Entry No. 13 at 16).  The Alley argues that because "the Policy provides for a separate deductible in the event of a named storm, the flood limitation does not apply to damages resulting from the named storm," meaning that its flood-damage claims would not be limited to $3 million.  (*Id.*).

Hanover responds that the Named Storm Deductible Endorsement does not create independent coverage for named storm events separate from wind, rain, or flood perils.  (Docket Entry No. 14 at 20).  Hanover argues that the Named Storm Deductible Endorsement "simply creates an additional deductible in the policy . . . [and] does not create independent coverage" for named storms that is not subject to the Policy's existing limits.  (Docket Entry No. 14 at 20).  The Alley responds that the Policy is an all-risk policy and covers named-storm damage unless it is expressly excluded.  (Docket Entry No. 13 at 17).  The Alley also argues that Hanover's interpretation would lead to a significantly higher deductible for named-storm damage, without a correspondingly higher recovery limit.  (*Id.* at 18).

The Named Storm Deductible Endorsement language favors Hanover's argument.  The Named Storm Deductible Endorsement replaces the deductible provision under "How Much We Pay" when "loss to covered property is caused by or results from a named storm," but the

---

[3] The Alley argues that Hanover "originally asserted that the named storm deduction should apply to all of the Alley's damages resulting from Hurricane Harvey, but then sought better of it and applied the lower flood deductible limit."  (Docket Entry No. 13 at 18 n.4).  At oral argument, the Alley explained that Hanover "indicated that was . . . out of the goodness of their heart," but the Alley argued that it was because Hanover was concerned "that in doing so, they would be conceding this issue with regard to named storms."  (Docket Entry No. 23).  Hanover did not respond to the Alley's theory.  Even if the Named Storm Deductible Endorsement were applied to the Alley's claim, that would not be a sufficient basis to find Hanover's contract interpretation argument was waived.

Endorsement does not alter the Policy limits.[4]   (Docket Entry No. 13-2 at 23).   Nothing in the Named Storm Deductible Endorsement creates a new covered peril for a "named storm," separate from the Policy's other covered perils, such as flood.   By stating that loss from a covered weather condition other than a named storm will be considered part of the named-storm occurrence, the Named Storm Deductible Endorsement specifies that other covered weather conditions will still be subject to the Endorsement's percentage deductible if the damage would not have occurred without the named-storm event.   This language does not create or define a new covered peril for named storms.

In *Six Flags Inc. v. Westchester Surplus Lines Insurance Company*, 565 F.3d 948, 955 (5th Cir. 2009), the Fifth Circuit held that a similar deductible endorsement applied only to the policy's deductible amount, without affecting the scope of coverage.   The all-risk policy at issue contained a per occurrence flood limit for loss caused by flood.   *Id.* at 951.   The policy also contained separate deductible amounts for flood damage and for named-storm damage.   *Id.*   The policy defined flood loss to "include all covered loss or damage to covered property resulting directly or indirectly from . . . inundation of normally dry land areas."   *Id.* at 952.   The policy also defined a "Weather Cat Occurrence"[5] as "all loss occurring during a 72-hour period caused by or resulting from, *inter alia*, Flood, wind, hail, sleet, tornadoes, hurricane, or lightening, associated with or occurring in

---

[4] The Alley argued the Hanover's interpretation would lead to the result of "burdening the insured with two limitations and no benefits: a far greater deductible and significant limitation on recoverable damages."   (Docket Entry No. 13 at 18).   The Alley is partially correct—the insured does have a greater deductible for named-storm damage.   But the insured also receives the benefit of insurance coverage. Named Storm Deductibles developed "[a]s part of a broad effort to keep insurance coverage available and affordable," while limiting "potential losses through higher deductibles."   *Hurricane and Named Storm Deductibles*, National Association of Insurance Commissioners (last updated May 17, 2019), https://content.naic.org/cipr_topics/topic_hurricane_deductibles.htm.
[5] The parties in *Six Flags* agreed that "Named Storm" and "Weather Cat" are interchangeable terms. 565 F.3d at 955.

conjunction with a storm or weather disturbance named by the National Weather Service." *Id.* at 956.

The plaintiff argued that the separate deductible endorsement precluded applying the flood sublimit to losses caused by named-storm flooding. *Id.* at 956–57. The Fifth Circuit disagreed, holding that the plaintiff's interpretation ignored the purpose of defining an occurrence, and that the flood sublimit applied "to loss or damage per occurrence as respects Flood, not 'per Flood Occurrence' or 'as respects the peril of Flood.'" *Id.* The court concluded that "to give meaning both to the definition of Flood and to 'per occurrence' in the Flood sublimit, the only reasonable interpretation is that the Flood sublimit applies across different types of occurrences to loss or damage that falls under the definition of Flood." *Id.* at 957. The court also distinguished an "occurrence" from a "peril," explaining that, "an occurrence, which groups certain losses for adjustment purposes, is distinct from the concept of a peril, which is the cause of the loss." *Id.*

Two years later, the Fifth Circuit clarified its holding in *Six Flags*, stating that "when a policy's flood definition did not exclude damage caused by other perils, then the flood limit of liability could apply, regardless of whether a hurricane caused the flood." *Id.* In *SEACOR Holdings, Inc. v. Commonwealth Insurance Company*, 635 F.3d 675, 683 (5th Cir. 2011), the court held that the general insurance limit, not the flood sublimit, applied to losses from a named storm. The *SEACOR* policy included a percentage deductible for loss "caused directly by the peril of a 'Named Windstorm,'" and a flood sublimit provision that applied to "[l]oss caused by the peril of Flood." *Id.* at 678. Flood was defined as "waves, tide or tidal water, inundation, rainfall . . . the rising (including overflowing or breakage of boundaries) of lakes . . . or similar bodies of water whether wind-driven or not." *Id.* at 684. The Fifth Circuit held that, in contrast to the "per occurrence" provision in *Six Flags*, the flood limit in *SEACOR* applied only to "[l]oss caused by

the peril of Flood," and SEACOR's damages were caused by the Named Windstorm so they could not trigger the flood liability limit. *Id.* at 683. The court explained that the "proper assumption for the perils that have deductibles but no defined liability limit, including Windstorm and Named Windstorm, is that only the cumulative liability limit applies to those perils." *Id.*

Unlike the *SEACOR* policy, the Alley's Policy does not refer to a Named Storm as a peril, but, like the *Six Flags* policy, as an occurrence. (*See* Docket Entry No. 13-2 at 23). The Policy's Named Storm Deductible Endorsement states:

> Loss or damage resulting from a covered weather condition, other than from a named storm, will be considered part of the named storm occurrence if loss or damage would not have occurred with out the weather conditions from the named storm.

(Docket Entry No. 13-2 at 23). This language does not unambiguously establish named-storm losses as a covered peril, but groups losses into a named-storm occurrence. But even if a named storm was a peril, as in *Six Flags*, the Policy's definition of flood does not exclude damages caused by other perils, meaning the $3 million Flood Endorsement Limit would still apply.

The Flood Endorsement Limit applies to direct physical loss caused by flood, even if the loss results from a named storm. The court denies the Alley's motion for summary judgment on this point and grants Hanover's motion for summary judgment on this point.

## IV.   Conclusion and Order

The Alley's motion for partial summary judgment, (Docket Entry No. 13), is granted in part and denied in part, and Hanover's motion for partial summary judgment, (Docket Entry No. 14), is granted in part and denied part. The court grants the Alley's motion, finding that, as a matter of law, the Policy's $3 million Flood Endorsement Limit does not apply to the Alley's business-interruption claim. The court grants Hanover's motion, finding that, as a matter of law, flood was a proximate cause of the sprinkler-leakage damage, making the Policy's $3 million

24

Flood Endorsement Limit applicable to those damages.  The court also grants Hanover's motion, finding that, as a matter of law, the Named Storm Deductible Endorsement does not create a separate covered peril, making the Policy's $3 million Flood Endorsement Limit applicable to direct physical loss caused by flood, even if the loss resulted from a named storm.

Hanover is ordered to file a proposed order reflecting these rulings no later than **February 14, 2020**.

SIGNED on January 31, 2020, at Houston, Texas.

_____

Lee H. Rosenthal
Chief United States District Judge